JOHN HILLER V. STATE OF NEBRASKA.

FILED MARCH 7, 1928. No. 25739.

*James E. Addie* and *T. M. Hewitt,* for plaintiff in error.

*O. S. Spillman, Attorney General,* and *Lloyd Dort, contra.*

Heard before GOSS, C. J., DEAN, GOOD, THOMPSON and EBERLY, JJ., and PAINE, District Judge.

PAINE, District Judge.

John Hiller, the plaintiff in error, hereinafter called the defendant, was found guilty by a jury in Dawson county, Nebraska, of the commission of the crime of mayhem, and was sentenced to not less than five years nor more than seven years in the penitentiary.

The county attorney filed an information against John Hiller and John Claus and charged them with feloniously throwing sulphuric acid upon the limbs of one Mary Ashley, a sixteen-year-old girl, with the intent to maim and disfigure her. The said John Claus pleaded guilty, and testified against his codefendant, who denied any connection whatever with the crime.

The bill of exceptions in this case consists of more than 400 pages of evidence, and only a brief summary of the salient facts will be given in this opinion. The defendant, a single man, was 32 years of age and had but one arm, and lived near the family of Mary Ashley for a number of months, and at Christmas, 1924, had given her a skating suit of a cap and sweater. He had pitched horseshoes and played croquet with Mary and the members of the family upon frequent occasions. In October, 1925, the father of the girls had advised him not to be around the girls so much, and the defendant stopped calling on the girls and soon moved into another part of the town of Cozad. John Claus was about 18 years of age and had been acquainted with Mary Ashley, who was injured, for only two weeks prior to the time of committing the crime, and testified that he knew her only by sight and had never kept company with her nor escorted her home.

About five days prior to the date of the crime charged in the information, when Mary Ashley and her sister were going through the park immediately after leaving a church service in the evening, John Claus and his brother, Philip Claus, 14 years of age, met them and threw sulphuric acid upon Mary and it burned her hand, but not seriously, and turned her plush cloak red in the spots where it struck the coat. John Claus testified that on this occasion the

defendant had accompanied the two brothers down to the Christian church and had furnished them the syringes and had filled them with sulphuric acid, and that then the defendant went over to the grandstand in the park with Alex Kiser and waited until the act was committed, and immediately after the acid had been squirted upon Mary Ashley the Claus brothers met the defendant and Kiser about half a block away. John Claus handed the defendant his syringe and the defendant said, "Why didn't you empty it on her?"

There is more conflict in the evidence as to what happened on Sunday night, April 25, 1926. John Claus, the accomplice, testified that he met the defendant and drove with him and others to Lexington in the afternoon, returning between 6:30 and 7:00 p.m.; that they went to Louie Hiller's house and the defendant got the syringes out from under a chicken coop where he had hidden them, and that he and the defendant started to clean them out and John Claus broke the one he was cleaning; that the defendant said that he had much stronger stuff to put in, and filled the remaining syringe from a bottle and then handed it to John Claus, who refused to take it. Claus testifies that the defendant then said to him: "You better now; you are offered $30 for doing this and if you don't you will get your neck broke." That the defendant told him to throw it on Mary Ashley or any of the Ashley family, and he went over to the Christian church close by and waited a half hour, standing beside a tree, and when the people came out of church he squirted this stuff from the syringe upon Mary Ashley; that the members of the Ashley family immediately accused him of doing the act, and he denied it until later in the evening when he had been taken into custody by the chief of police. He testifies that he did not know what its effect would be except that the defendant had told him that it would eat their clothes off; that he had no personal ill will toward any member of the Ashley family; that he and his brother and the defendant were immediately arrested that night and taken to Lexington and put in the county jail; that upon being jointly

charged in this same complaint with the defendant he pleaded guilty in the county court and later pleaded guilty in the district court and that he had been promised no immunity from punishment. Alex Kiser, a sixteen-year-old lad, who was with Claus and the defendant on several occasions, corroborated the testimony of John Claus upon the vital points in the case. Philip Claus, fourteen years old, also corroborates the testimony of his brother John.

The defendant, John Hiller, took the stand in his own behalf, and stated that he had known the Ashley girls ever since they were small children; that he was ofttimes at their place, but after he had moved away from that part of town he did not visit them so often. He denied the testimony of all others who said they had seen him in front of the church before the services started, and also denied that he had driven past the Ashley home in his car several times during the Sunday afternoon that the offense was committed. He admitted that he had been to his brother Louie Hiller's house Sunday evening, but that he went there solely for the purpose of getting a mouth-harp and that he did not meet John Claus there or at any time that evening before his arrest; that he did not know anything about the acid being thrown upon Mary Ashley until two days after he was arrested. He explained that he purchased a six or eight-ounce bottle of pure sulphuric acid for the purpose of recharging a battery in a car that he had traded for the day before, and that he used all of the acid in the run-down battery in that car. He testified that he and his brother George had been in the automobile repair business for many years and were familiar with the use of sulphuric acid in charging of batteries. He denied taking any part in or having any knowledge of the crime charged, and denied making any threats or offering any money to John Claus to commit the act, and in many of these points his testimony was corroborated by several of his own witnesses.

Dr. Charles H. Sheets testified that he treated the wounds immediately after the act was done; that there

were several burns upon the limb of Mary Ashley, and from about the knee area to the ankle it looked as if it had been painted with ink; that the black silk hose she wore had been entirely dissolved where the acid struck it, and that part of her shoe was charred by the sulphuric acid burns; that he treated it with ammonia and afterwards boric acid solution, and that it was slow in healing; that the outside skin was entirely charred and dissolved away, and that later on he had been compelled to cut out a part of the disintegrated tissue; that the acid caused a sort of dry gangrene which had to be removed. The witness pointed out to the jury three distinct scars, the deepest one being about four inches below the knee. In pointing out the injury Dr. Sheets testified that one scar was two and a half to three inches long by an inch and a quarter to an inch and a half wide, and it was taking on a connecting tissue growth, and stated to the jury: "We have here what we call a telloid growth, which continues to grow and sometimes requires X-ray treatment to clear up, and requires cutting out of the scar tissue." He stated that the skin which covered the scar was a very delicate tissue and does not have the resisting qualities of natural skin; that any injury would be very apt to break it down, and that poor circulation later in life would do that, and that if this tissue broke down it would result in a running sore; that he had continued to dress the wounds for a period of six months after the injury.

Upon the evidence produced the jury returned a verdict of guilty against the defendant, John Hiller.

It is impossible to review and discuss all of the eighteen grounds for reversal found in the brief of the defendant. The right of the trial judge to give a portion of the section of the statute setting out the crime is questioned, and defendant insists that it must be given in its entirety.

The defendant in his brief urges strongly that the facts in this case do not warrant a conviction of anybody under the crime of mayhem.

This crime is set out in section 9549, Comp. St. 1922,

which reads as follows: "Whoever shall willfully, unlaw-fully and purposely cut or bite the nose, lip or lips, ear or ears, or cut out or disable the tongue, put out an eye, slit the nose, ear, or lip, cut or disable any limb or member of any person, with intent to murder, kill, maim, or dis-figure such person, shall be imprisoned in the penitentiary, not more than twenty years nor less than one year." And the defendant argues that this section describes a crime which must deprive the injured party of his members or render him less able in fighting, and that the injury must always be a permanent injury, and cites definitions from Bouvier's Law Dictionary in support thereof.

It is admitted that mayhem at common law was defined as the violently depriving another of the use of such of his members as may render him less able in fighting, either to defend himself or to annoy his adversaries (4 Blackstone, *205) and at ancient common law was pun-ished by a forfeiture of member for member and was deemed a felony. *Commonwealth v. Newell*, 7 Mass. 245.

The trial judge did not confuse the jury by giving to them the entire section quoted above, but in instruction No. 4 he said:

"The jury is further instructed that the Criminal Code of Nebraska defines the offense with which the defendant is charged in the second count of said information. So far as is necessary for the purpose of this case, the statute is, in substance, as follows: 'Whoever shall wilfully, unlaw-fully and purposely disable any limb or member of any person, with intent to maim or disfigure such person, shall be punished as by law provided.' "

This gave the jury all of that part of the section of the statute which was applicable to the case on trial and natu-rally did not give the jury the punishment to be meted out in case of a verdict of guilty, for the punishment is solely within the duty of the court, and not for the consideration of the jury. *Strong v. State*, 63 Neb. 440; *Holmes v. State*, 82 Neb. 406; *Simmons v. State*, 111 Neb. 644.

In this case the essential facts to sustain a conviction of

mayhem must show, first, an injury; second, malice on the part of those perpetrating the crime, and third, an intent to maim and disfigure. Underhill, Criminal Evidence (2d ed.) sec. 359. Let us consider for a moment a case in which these elements are lacking. In the case of *Dahlberg v. People,* 225 Ill. 485, it was held: "One cannot be convicted of an attempt to commit mayhem by destroying an eye with red pepper, there being no other evidence of intent than the throwing of the pepper, and the evidence showing that an eye cannot be destroyed by red pepper, unless it is allowed to stay in the eye longer than it would take to remove it in the ordinary course of events." (80 N. E. 310.)

But in the case at bar we have a scar of considerable size which at the time of the trial was covered with a scar tissue in which was found a telloid growth which would require X-ray treatment and perhaps the cutting out of the scar tissue; that this tissue would always have a poor circulation, and later in life, under conditions normal to a woman, the tissue might be broken down and result in a running sore.

This state of facts certainly justified the court in instructing the jury under mayhem, and warranted submitting to the jury whether the facts showed that the limb would be disabled, maimed and disfigured. The injury suffered was the result of premeditated malice and a clear intent to maim and disfigure the injured part, and the trial court was justified in refusing to submit an instruction of simple assault and battery, believing that the defendant was guilty of the crime of mayhem or nothing.

The defendant objects to that part of instruction No. 7 given by the court which reads: "If the defendant, John Hiller, was aiding and abetting John Claus in throwing the 'poison,' then the acts and doings of John Claus in the throwing of the poison are to be treated by you in your deliberation as the acts of John Hiller in this trial." The defendant maintains that the word "poison" was not mentioned either in the information or in the evidence, and

that such use of the word "poison" was very prejudicial to the defendant.

Poison may well be defined as any substance which when introduced into the system, either directly or by absorption, produces violent morbid or fatal changes or which destroys living tissue with which it comes in contact. Such definition clearly includes sulphuric acid because of the effects which it produces upon the human flesh, and the defendant was not prejudiced by the introduction of the word "poison" into the seventh instruction by the court, in the place of the words "sulphuric acid."

Error is alleged by the defendant because in the definition given upon reasonable doubt, "The court speaks of the same being based upon all the testimony and every part of it, but does not mention the fact that the doubt might arise from the want of evidence." Let us examine the entire instruction No. 8 as given by the trial court, which reads as follows:

"By the term 'reasonable doubt,' as used in these instructions, is meant an actual doubt, one that you are conscious of after going over in your minds the entire case, giving consideration to all the testimony and every part of it. If you then feel uncertain and not fully convinced that the defendant is guilty and believe you are acting in a reasonable manner, and believe that a reasonable man, in any matter of like importance, would hesitate to act because of such a doubt as you are conscious of having, then that is a reasonable doubt, of which the defendant is entitled to have the benefit."

To this instruction the defense takes exception because it does not mention the fact that the doubt might arise from the want of evidence, and cites *Cowan v. State,* 22 Neb. 519, although the instruction given in that case does not entirely support the defendant in its claim. The trial courts of the state have very frequently stated in giving an instruction on reasonable doubt that it was a term well understood but difficult to define, and many of the decisions are reviewed in the case of *Goemann v. State,*

100 Neb. 772, and it is held in that case that reasonable doubt may arise from a want of evidence, thereby adhering to the opinion in *Whitney v. State,* 53 Neb. 287. In the dissenting opinion in *Goemann v. State, supra,* it is stated that the jury should acquit the defendant whether the doubt arises from the evidence, the lack of evidence, or from a conflict in the evidence. However, it is impossible to exclude all doubt in the trial of a criminal case, and the following instruction is often given in the United States district court for Nebraska on this point: "The court will not undertake to define reasonable doubt further than to say that a reasonable doubt is not an unreasonable doubt; that is to say, by a reasonable doubt you are not to understand that all doubt is to be excluded, for it is impossible in the determination of these questions to be absolutely certain. You are required to decide the question submitted to you upon the strong probabilities of the case, and while the probabilities need not be so strong as to exclude all doubt or possibility of error, yet the probabilities must be so strong as to exclude all reasonable doubt." See *Dunbar v. United States,* 156 U. S. 185, 199. While the question is one that has been before this court innumerable times, yet the instruction given by the trial court in this case is very brief and follows in the main several approved forms upon reasonable doubt, and we believe it fairly instructs the jury on this point and is without error. Without doubt trial judges in all parts of the United States have for many years been partial to the instruction upon reasonable doubt given in the very able charge of Chief Justice Shaw in the trial of the homicide case of *Commonwealth v. Webster,* 5 Cush. (Mass.) 295, 320, 52 Am. Dec. 711, and while this instruction is a long one it seems to have been approved by the highest courts in every jurisdiction, and is given at length in the case of *Carr v. State,* 23 Neb. 749; and yet this instruction does not state specifically that the doubt may arise from want of evidence, but simply states, "if there is reasonable doubt remaining."

It is impossible to discuss further the contentions of the

defendant. The jury did not believe the testimony of the defendant, and we cannot set our judgment up against that of the jury who had the advantage of hearing and seeing each witness.

The judgment of the trial court is

AFFIRMED.