COMMONWEALTH vs. ALAN HOGAN & others[1]
(and two companion cases).

Essex.    December 11, 1978. — March 20, 1979.

Present: HALE, C.J., GRANT, & ARMSTRONG, JJ.

*Mayhem. Assault and Battery. Accessory. Joint Enterprise. Identification. Practice, Criminal,* Variance, Duplicitous convictions, Duplicitous punishment. *Evidence,* Cross-examination, Telephone conversation, Business record, Information stored on computer. *Witness,* Cross-examination.

A judge at a criminal trial erred in refusing to allow the defendants to cross-examine two Commonwealth witnesses as to indictments pending against them, with the stated purpose of showing the witnesses' bias, even though it was unlikely that the witnesses' testimony was motivated by promises of special treatment of the pending charges. [240-242]

At a criminal trial, evidence that one of three defendants remained in an automobile while the other two entered an apartment carrying clubs and severely attacked the occupant of the apartment, although sufficient to warrant a finding that the defendant who remained behind had the specific intent to assist in the commission of assault and battery with a dangerous weapon, was insufficient to show that he possessed a specific malicious intent to maim or disfigure the victim as required for a conviction on a charge of mayhem under G. L. c. 265, § 14. [242-245]

At a criminal trial, evidence of the defendant's participation in a vicious beating which resulted in at least the temporary disablement of the victim's limbs due to multiple fractures was sufficient to sustain a conviction of mayhem under G. L. c. 265, § 14. [245-247]

Even though convictions on indictments charging assault and battery with a dangerous weapon and mayhem each required the proof of a fact which the other did not, consecutive sentences should not have been imposed upon such convictions where the judge charged the jury in terms that the jury could have mistakenly understood

---

[1] Gilbert LaRocque and Joseph F. Quartarone, Jr.

to mean that the same evidence could establish the basis for a conviction on each of the indictments. [247-249]

At a criminal trial, the judge did not err in allowing a witness to testify to two threatening telephone calls he had received and to the fact that he recognized the voice of the caller as that of one of the defendants where there was evidence that the witness knew the defendant's voice because of a prior contact and had heard the telephone conversations himself. [249-250]

Computer printout sheets listing automobiles with certain registration numbers, which were stored on a computer by the Registry of Motor Vehicles, were admissible at a criminal trial as business records under G. L. c. 233, § 78. [250-252]

The judge at a criminal trial was warranted in finding that in-court identifications of the defendant by three witnesses had bases independent of suggestive photographic procedures and were untainted by those procedures. [252-254]

INDICTMENTS found and returned in the Superior Court on September 15, 1975.

The cases were tried before *Donahue, J.*

*Robert E. Dinsmore* for Gilbert LaRocque.

*Alan P. Caplan* for Alan Hogan.

*James B. Krasnoo* for Joseph F. Quartarone, Jr.

*Peter Carrozza*, Assistant District Attorney, for the Commonwealth.

HALE, C.J. The defendants appeal (G. L. c. 278, §§ 33A-33G) from their convictions of kidnapping (G. L. c. 265, § 26), assault and battery by means of a dangerous weapon (G. L. c. 265, § 15A) and mayhem (G. L. c. 265, § 14),[2] and among them argue numerous assignments of error.[3] We summarize the facts as they could have been found by the jury, adding later more details as needed for the determination of particular assignments of error.

---

[2] That indictment alleged that the defendants "did assault Theodore Condon, and with malicious intent to maim and disfigure said Theodore Condon, did tear off an ear and disabled a limb of said Theodore Condon."

[3] The defendants were also tried on an indictment charging assault and battery with intent to collect a loan (G. L. c. 265, § 13C). A verdict was directed on that charge at the close of the prosecution's case.

Linda Condon spent the evening of Friday, August 8, 1975, in or around two Beverly bars while her husband, Theodore Condon, remained at home in their Newburyport apartment. She had met several friends and was intoxicated by 1:00 A.M. when the bars started to close. As she was leaving one of the bars she encountered the defendant Hogan, whom she recognized as an old acquaintance who had been a member of the Hell's Angels motorcycle club with her husband several years earlier. Hogan spoke with her briefly and then, while maintaining a strong grip on her arm, guided her against her will into the back seat of a large, white, four-door car with a black top, which was parked nearby. Already in the car were the driver, later identified as the defendant Quartarone, and a rear seat passenger, subsequently identified as the defendant LaRocque.

The car drove off after Hogan entered the front passenger's seat, starting a journey which would continue, punctuated by a series of stops, until approximately 5:30 A.M. on August 9. During the drive Hogan struck Mrs. Condon several times, expressed a desire to "get" her husband, and spent much time talking in whispers with the driver. LaRocque held on to Mrs. Condon to prevent her escape. Mrs. Condon could remember nothing eventful which occurred at the first several stops the car made. The third stop that she remembered was at the Condons' apartment in Newburyport, where Hogan forced her to give him the keys to her apartment. While LaRocque kept her in the back seat, she saw Hogan and Quartarone standing outside the car holding clubs. She saw them enter her apartment building with the clubs and return about twenty minutes later.

In the apartment Theodore Condon awoke to find Hogan and another person standing over him. He heard Hogan say, "Hello Teddy," and was then immediately knocked unconscious by a blow from a club. Condon was found the next morning suffering from severe injuries which included fractures of the right thigh bone (femur)

and of both lower leg bones (tibiae) which had been caused by blows from a heavy instrument such as a club.[4]

When Quartarone and Hogan returned and reentered the car, all proceeded to a motel in Peabody, where a room was hired. Quartarone and Hogan conferred briefly before leaving Mrs. Condon and LaRocque in the motel room at approximately 5:30 A.M. LaRocque soon fell a-sleep and Mrs. Condon called for the police. She climbed through a window, met the police officers as they arrived, and directed them to the room where LaRocque was found.

The jury could also have found that a white, four-door Cadillac with a black top occupied by Mrs. Condon, Hogan, Quartarone and LaRocque stopped for gasoline at a service station at approximately 2:30 A.M. on August 9. One Ricker, an attendant at the station that night who put gas in the car, and one Dalton, an off-duty employee of the station who stood near the station office, observed the features and activities of all four occupants of the car from close range. Each observed Mrs. Condon burst out of the car and run toward the station office, crying out for help. Hogan had gone to the office to use the telephone, and Mrs. Condon turned away from the office when she observed him there. Quartarone and LaRocque chased her as she ran. LaRocque caught her and, with Quarta-rone's help, forced her back into the car. Both made comments, apparently intended for Ricker's hearing, attempting to explain away her unusual behavior. At about the same time, Hogan threatened to kill Dalton if he contacted the police. Both Ricker and Dalton observed the license plate of the car and noted several of the digits of the license number, although their later descriptions of the numbers differed slightly from each other. Records

---

[4] Other injuries included a severe contusion of the left side of his face, a through-and-through laceration of his left ear, a perforated left ear-drum, and a fracture of the base of the skull. He had a one-inch sharply incised wound on his left upper arm. He also had multiple fractures of the jaw bone and two fractured ribs.

of the Registry of Motor Vehicles disclosed that the only white Cadillac with a Massachusetts registration number which would match either of those described was registered to Quartarone, a police officer of the city of Beverly. Ricker recognized the driver as a Beverly police officer with whom he had previously had contact and mentioned this to Dalton, but at that time he was unable to recall the officer's name.

1. During the cross-examination of Linda and Theodore Condon, defense counsel attempted to show that a number of indictments were pending against both witnesses.[5] That evidence was offered for the stated purpose of demonstrating bias in the testimony of both witnesses because of a possible inference that their testimony had been elicited by offers of special consideration in the disposition of those charges. The judge held a voir dire examination of both witnesses. He determined over objection and exception that the Commonwealth had made no promises with regard to the outstanding drug indictments in exchange for the Condons' testimony. He then excluded all the defendants' questions directed to this subject. He also ruled that he would not allow a general question as to the existence of government promises, rewards, or inducements unless some factual basis other than the outstanding drug charges could be given. The defendants were unable to show such a basis, and no question concerning bias was allowed. The defendants voiced appropriate exceptions.

---

[5] On September 17, 1971, more than four years before the present trial, Linda Condon (then McDonald) and Theodore Condon were indicted on the following charges: possession of marihuana, possession of morphine, possession of heroin, possession of seconal, possession of heroin with intent to sell and possession of a hypodermic syringe and needle. Defaults were entered on November 27, 1974, the cases were "placed on file to locate," and a capias was issued as to each. No allegation is made that those charges were in any way related to the instant trial except as they might relate to bias of the witnesses.

"The defendants are entitled, as of right, to reasonable cross-examination of a witness for the purpose of showing bias, particularly where that witness may have a motivation to seek favor with the government." *Commonwealth* v. *Dougan*, 377 Mass. 303, 310 (1979), and cases cited.[6] *Commonwealth* v. *Ahearn*, 370 Mass. 283, 287 (1976). *Commonwealth* v. *Franklin*, 376 Mass. 885, 904 (1978). A defendant has the right to present to the jury his theory of a witness's bias and facts that could support that theory. *Alford* v. *United States*, 282 U.S. 687, 693 (1931). *Davis* v. *Alaska*, 415 U.S. 308, 317-318 (1974). *Commonwealth* v. *Franklin*, 366 Mass. 284, 290 (1977). *Commonwealth* v. *Ahearn, supra. Commonwealth* v. *Franklin, supra* at 904. Cf. *Gordon* v. *United States*, 344 U.S. 414, 422-423 (1953).

A trial judge may not entirely preclude inquiry regarding criminal charges pending against a witness simply because he does not believe that the facts would support an inference of bias. Compare *Commonwealth* v. *Johnson*, 365 Mass. 534, 542-544 (1974); *Commonwealth* v. *Cumming*, 6 Mass. App. Ct. 884 (1978). Contrast *Commonwealth* v. *Campbell*, 5 Mass. App. Ct. 571, 588-589 (1977).

The exclusion of a legitimate question for cross-examination is, however, a matter within the judge's discretion if the subject of the defendant's inquiry is brought adequately to the jury's attention by other questions during the course of cross-examination. See, e.g., *Commonwealth* v. *Walker*, 370 Mass. 548, 572, cert. denied 429 U.S. 943 (1976); *Commonwealth* v. *Franklin*, 376 Mass. at 904-905 (1978); *Commonwealth* v. *Dougan*, 377 Mass. at 310 (1979); *Commonwealth* v. *Dominico*, 1 Mass. App. Ct. 693, 713-714 (1974). In the present case the evidence which the excluded questions were calculated to adduce was not otherwise placed before the jury.

---

[6] While this right of cross-examination in criminal cases may sometimes rise to constitutional proportions (see *Davis* v. *Alaska*, 415 U.S. 308, 318 [1974]; *Commonwealth* v. *Johnson*, 365 Mass. 534, 543 [1974]; *Commonwealth* v. *Ferrara*, 368 Mass. 182, 189-190 [1975]; contrast *Commonwealth* v. *Santos*, 376 Mass. 920, 923-926 [1978]), we do not need to consider the case on that basis.

Although we agree with the judge that, under the circumstances, it was unlikely that the witnesses' testimony was motivated by promises of special treatment of the pending charges, we hold that the defendants were entitled to present their theory of bias by showing the existence and prosecutorial status of those charges for the consideration of the jury.[7] The jury could have inferred that those charges constituted "a prosecutorial threat to the witness[es]' freedom," (contrast *Commonwealth* v. *Santos*, 376 Mass. at 926 [1978]) and thus that the witnesses were particularly vulnerable to governmental pressure. This fact could have caused the jurors to discount the Condons' crucial testimony. We cannot say that the exclusion of this evidence was harmless. Reversal of the convictions is required.

LaRocque did not assign as error, nor did he brief, his exceptions to the rulings just discussed. Had he done so, we would have sustained them. The errors affected all defendants equally, and it would be anomalous if Hogan and Quartarone should receive a new trial but LaRocque should not. Compare *Commonwealth* v. *Nelson*, 3 Mass. App. Ct. 90, 101 (1975), *S.C.* 370 Mass. 192, 195, 203 (1976). Accordingly, LaRocque is also to have a new trial.

2. LaRocque argues that a verdict should have been directed in his favor on the charge of mayhem (No. 86122) because the evidence adduced was insufficient to warrant submission of the case to the jury. "The appellate standard of review is whether the evidence, read in a light most favorable to the Commonwealth . . . is sufficient so that the jury 'might properly draw inferences, not too remote in the ordinary course of events, or forbidden by any rule of law, and conclude upon all the established circumstances and warranted inferences that the guilt of

[7] We note that Quartarone was a police officer and the president of the local police benevolent association. The jury could have considered that the police might have been particularly desirous of building as strong a case as possible against one whom they regarded as a rogue cop.

the defendant was proved beyond a reasonable doubt.'" *Commonwealth* v. *Clifford*, 374 Mass. 293, 296 (1978), (and cases cited), quoting from *Commonwealth* v. *Vellucci*, 284 Mass. 443, 445 (1933).

We look first to LaRocque's argument in his brief that he should have been acquitted of mayhem because it was not proved as charged. He contends that the indictment charging him with mayhem did not contain the words of G. L. c. 265, § 14, or their equivalent, providing for the guilt of "whoever is privy to [the intent to maim or disfigure], or is present and aids in the commission of [mayhem]," and that the Commonwealth based its case against him on the theory that he was privy to the intent of the principals and was present, aiding and assisting in the commission of the crime. LaRocque neither specifically stated this ground in his motion for a directed verdict, brought it out in argument to the judge, nor made it the subject of an exception or an assignment of error, so it is not properly before us. The indictment in any event stated the essential elements of the crime and the defendant does not argue, nor does our perusal of the record reveal, that he was in any way prejudiced in his defense by the wording of the indictment. G. L. c. 277, § 35. See *Commonwealth* v. *Grasso*, 375 Mass. 138, 139 (1978); *Commonwealth* v. *Clark*, 5 Mass. App. Ct. 673, 677-678 (1977).

LaRocque argues principally, however, that the evidence adduced at trial was insufficient to warrant a finding that he had the specific intent to assist Hogan and Quartarone in the mayhem or that he had, in the words of *Commonwealth* v. *Richards*, 363 Mass. 299, 308 (1973), "a willingness to see [it] take place should it become necessary."[8]

---

[8] In order to hold a person criminally responsible for the acts of others, the Commonwealth must show that "he intentionally assisted the principal[s] in the commission of the crime and that he did this, sharing with the principal[s] the mental state required for that crime." *Commonwealth* v. *Richards*, 363 Mass. 299, 307-308 (1973). *Commonwealth* v. *Jones,* 6 Mass. App. Ct. 750, 758-759 (1978), and

We agree that the language of G. L. c. 265, § 14, under which LaRocque was charged, providing for the guilt of one who commits certain disabling or disfiguring acts on another person "with malicious intent to maim or disfigure," can only be satisfied by proof of specific intent to do the proscribed acts. See *Patterson* v. *State*, 30 Ala. App. 135, 136 (1941); *Hiller* v. *State*, 116 Neb. 582, 588 (1928); *Banovitch* v. *Commonwealth*, 196 Va. 210, 216 (1954); *State* v. *Bloedow*, 45 Wis. 279, 280 (1878); Lafave & Scott, Criminal Law § 83; Perkins, Criminal Law 184-189 (2d ed. 1969); Nolan, Criminal Law § 328 (1976). See also *Commonwealth* v. *Blaney*, 133 Mass. 571, 572 (1882). But see *Brown* v. *United States*, 171 F.2d 832, 833 (D.C. Cir. 1948); *People* v. *Garcia*, 5 Cal. App. 3d 15, 18-19 (1970). The specific intent "to maim or disfigure" can be established by the showing of an intent to inflict "some serious bodily injury." *Commonwealth* v. *Farrell*, 322 Mass. 606, 619 (1948). Malice may be inferred from the act. *Commonwealth* v. *Lamothe*, 343 Mass. 417, 419-420 (1961).

The only evidence in the record tending to establish LaRocque's state of mind with respect to the attack on Theodore Condon came from Linda Condon. She testified that at two or three points during the car ride Hogan said in LaRocque's presence that he was going to "get" Condon because he "deserves what's coming to him." While sitting in the back seat with LaRocque when the car was parked at her apartment, Mrs. Condon saw Hogan and Quartarone carrying clubs just before they went up to the apartment where Condon was sleeping and was subsequently found injured. The jury could infer from this

---

cases cited. It must also show that the principal is guilty of that offense.

LaRocque does not argue that there was insufficient evidence of his participation in the joint venture, so we confine our review to the sufficiency of the evidence of his mental state with respect to the conduct of Hogan and Quartarone and the results thereof. The acts of and the injuries inflicted by Hogan and Quartarone are a sufficient basis for a finding of their guilt of mayhem. See *infra*, part 3.

testimony that LaRocque was aware of and acquiesced in (at least on a contingent basis) the use of weapons in an attack on Condon. Such a mental state, LaRocque agrees, was sufficient to sustain the conviction of assault and battery by means of a dangerous weapon. See *Commonwealth* v. *Ferguson*, 365 Mass. 1, 9 (1974); *Commonwealth* v. *Mangula*, 2 Mass. App. Ct. 785, 792 (1975); *Commonwealth* v. *Gallagher*, 4 Mass. App. Ct. 661, 662 (1976); *Commonwealth* v. *Clark*, 5 Mass. App. Ct. 673, 678 (1977). However, the Commonwealth adduced no evidence that LaRocque possessed or was privy to the required specific malicious intent to maim or disfigure Condon in the course of the attack.[9] Further, even though a person may be taken to intend the natural and probable consequences of his acts (*Commonwealth* v. *Farrell*, 322 Mass. at 619), we do not believe that the Commonwealth has shown behavior on the part of LaRocque which warrants a reasonable inference that he was privy to the malicious intent of his companions that Condon be maimed or disfigured. The crime of mayhem is a greatly aggravated form of assault and battery. The intent to commit assault and battery, even with a dangerous weapon, falls short of the intent required to commit mayhem. It was error to deny LaRocque's motion for a directed verdict on indictment No. 86122.

3. Quartarone argues that he too was entitled to a directed verdict of not guilty on the mayhem charge. He contends that there was insufficient evidence to allow the jury to find that a requisite element of the crime was established.[10] The portion of the mayhem statute under

[9] Contrast *Mabry* v. *State*, 40 Ala. App. 129, 134-135, cert. denied 268 Ala. 660 (1959), and *State* v. *Bass*, 255 N.C. 42, 51-52 (1961), where the intent to maim on the part of a passive accessory to an incident of mayhem was clearly proved.

[10] Quartarone does not argue as a reason for a directed verdict that there was no evidence that he actually struck Condon. It is reasonable to infer that, even if Quartarone did not strike the blows that caused the disablement of Condon's legs, he was present and aiding in the

which Quartarone was indicted requires that the Commonwealth show that the defendant cut out or maimed the tongue, put out or destroyed an eye, cut or tore off an ear, cut, slit, or mutilated the nose or lip, or cut off or disabled a limb or member of another person. G. L. c. 265, § 14.[11]

The evidence of Quartarone's participation in the vicious beating which resulted in the disablement of Condon's limbs due to the multiple fractures was sufficient to sustain a conviction under the portion of G. L. c. 265, § 14, on which the indictment was framed, and the motion for a directed verdict was properly denied. Compare *Commonwealth* v. *Farrell*, 322 Mass. at 618-619; *Commonwealth* v. *Michel*, 367 Mass. 454, 458-459 (1975). Cf. *United States* v. *Cook*, 462 F.2d 301, 304 & n.23 (D.C. Cir. 1972). We note that the disablement of Condon's limbs may not have been permanent, but we do not believe that this requires a different result. In *Commonwealth* v. *Farrell*, 322 Mass. at 619, the court held that an injury could amount to a "crippling" within the meaning of the statute "even though there may be complete recovery in

offense. In such circumstances there would be no difficulty in finding that Quartarone, although a relatively passive party, could be guilty of mayhem as a joint venturer. See *Commonwealth* v. *Richards*, 363 Mass. at 307-308.

[11] The second portion of § 14 would allow a conviction of mayhem for a more general range of injury. It provides for criminal responsibility of one who "with intent to maim or disfigure, assaults another person with a dangerous weapon, substance or chemical, and by such assault disfigures, cripples, or inflicts serious or permanent physical injury upon such person." The two parts represent distinctive and independent bases of liability. *Commonwealth* v. *Farrell*, 322 Mass. at 618-619. Compare *State* v. *Benjamin*, 102 Ohio App. 14 (1956).

The defendants were not indicted under the second portion of the statute. However, the judge charged the jury, without objection from either side, as to the possibility of guilt under both the first and second portions of the statute. We do not here address other possible implications of this instruction, but we note that our examination of the sufficiency of the evidence of mayhem will be based only on the portion of the statute under which Quartarone was indicted.

time," and we believe that this also holds true for disablement of the limbs.

We consider the remaining issues as they involve matters likely to arise at retrial.

4. Hogan and Quartarone were convicted of and received consecutive sentences for assault and battery with a dangerous weapon and mayhem. Both convictions were based on the beating they administered to Theodore Condon. At trial Hogan excepted to the denial of his motion to compel an election between the two charges and, along with Quartarone, to the imposition of consecutive sentences. They argue now that these crimes were essentially identical and that conviction of, and consecutive sentencing for, the two crimes constitutes double jeopardy.

The longstanding rule in Massachusetts is to the contrary. "A single act may be an offence against two statutes; and if each statute requires proof of an additional fact which the other does not, an acquittal or conviction under either statute does not exempt the defendant from prosecution and punishment under the other." *Commonwealth* v. *Gallarelli*, 372 Mass. 573, 577 (1977), quoting from *Kuklis* v. *Commonwealth*, 361 Mass. 302, 306 (1972), and *Morey* v. *Commonwealth*, 108 Mass. 433, 434 (1871). See *Brown* v. *Ohio*, 432 U.S. 161, 166 (1977); *Commonwealth* v. *Kiley*, 373 Mass. 454, 461 (1977); *Commonwealth* v. *Grasso*, 375 Mass. 138, 140 (1978). For offenses to be identical they must be the same in law and in fact. If the offenses are distinct in law, it is of no consequence how nearly they may be connected in fact. *Kuklis* v. *Commonwealth*, 361 Mass. at 307. The same principle applies in the determination of whether the indictments are duplicitous.

For conviction of assault and battery with a dangerous weapon, the Commonwealth must prove that a dangerous weapon was employed in the assault. Mayhem as charged in this case does not require proof of the use of a dangerous weapon, but it does require proof that the defendant possessed the specific malicious intent to maim or disfig-

ure and that he inflicted a particular form of injury on the victim. Neither a specific malicious intent to maim nor the infliction of a particular injury is an element of the crime of assault and battery with a dangerous weapon. As each crime requires the proof of a fact which the other does not, a conviction of one is no bar to a conviction of the other, and no election need be made between the two. *Salemme* v. *Commonwealth*, 370 Mass. 421, 423-424 (1976). Nor as the charges were framed in this case was there a legal bar to the imposition of consecutive sentences. *Id.*

However, we are obliged to conclude that because of the judge's charge, the jury could have mistakenly understood that the same evidence could establish the basis for a conviction on each of these indictments. In his charge the judge described assault and battery with a dangerous weapon in general terms, indicating that a dangerous weapon "could be a knife, could be a gun, a gun is a dangerous weapon in itself, could well be a club; could well be any instrumentality; the manner in which it is used could be dangerous or likely to cause harm."

In his charge on mayhem the judge read G. L. c. 265, § 14, in its entirety so that the jury had before them the second part of the statute — "Whoever with intent to maim or disfigure assaults another person with a dangerous weapon . . . ." While the judge went on to describe what constitutes maiming, he made no further mention of the word "malicious," nor did he define malice. He did instruct the jury on the difference between the two crimes saying, "Now, you have heard me give a definition of assault and battery with a dangerous weapon and mayhem. You may say, is there a difference between the two crimes? Well, of course there is. It is obvious when you read both statutes.

"Let us take an example of two men who have an altercation in a barroom. One man, the defendant, picks up a club and strikes at the victim with a club. The jury could well find that one striking that the defendant committed

as an assault and battery with a dangerous weapon on that particular victim, that one blow. However, suppose after the first blow the victim fell to the floor senseless, unconscious, and that there was evidence presented that the defendant then went on with the club and methodically beat the victim so that the victim's limbs were crippled or that he was maimed or disabled for a considerable period of time or for a permanent time. That is the difference. It is the aggravated form of assault that is different. The initial assault could be termed assault and battery with a dangerous weapon. What happens subsequently, if the jury so finds, may well be evidence of mayhem."

We think that the judge's separation of the first blow in the series as the one on which the jury could base a conviction for assault and battery with a dangerous weapon with the subsequent blows as the basis for a conviction of mayhem draws too fine a line. We are of the opinion that the series of blows comprised a single event and that as both convictions were based on that event they were based on the same evidence. That being so, consecutive sentences should not have been imposed. *Commonwealth* v. *Cerveny*, 373 Mass. 345, 354-356 (1977). *Commonwealth* v. *Stewart*, 375 Mass. 380, 390-392 (1978).

5. Hogan and Quartarone argue that the judge erred in admitting Dalton's testimony of two telephone calls he received on August 17 and 21 while working at the gas station where he had witnessed the incidents which occurred there. The caller threatened to kill him if he should testify in this case. He testified that he recognized the voice of the caller (although not with total certainty) as that of Hogan. Dalton stated that he had heard Hogan's voice on the morning of August 9 when he had spoken with him during the incident in the service station. He stated that because of this contact he knew the voice well enough to identify it.

The evidence that Dalton knew Hogan's voice because of their prior contact and that he had heard the threatening telephone conversations himself was sufficient to au-

thenticate his identification of Hogan's voice on these telephone calls and to allow admission of the testimony. *Chartrand* v. *Registrar of Motor Vehicles*, 345 Mass. 321, 325 (1963). *Commonwealth* v. *Murphy*, 356 Mass. 604, 611 (1970). It was for the jury to determine how much weight, if any, to give to this testimony.

6. The Commonwealth called Inspector McCabe, the keeper of the records for the Registry of Motor Vehicles, in rebuttal. Through McCabe the Commonwealth introduced computer printout sheets listing the cars with registration numbers corresponding to the partial license number observed during the incident in the service station by Ricker and Dalton. The sheets indicated that only one white, four-door Cadillac had a Massachusetts license number corresponding to the partial numbers described by Ricker and Dalton. That car was registered to Quartarone. McCabe stated that it was the practice of the Registry to keep the license number, make, type, and color, as indicated on the applications for registration of all motor vehicles registered in Massachusetts, on their computer as ordinary business records. Hogan and Quartarone argue that those records should have been excluded because an inadequate foundation was laid to allow their admission under the business records exception to the hearsay rule. G. L. c. 233, § 78, as appearing in St. 1954, c. 442, § 1.[12] We disagree.

---

[12] General Laws c. 233, § 78, as so appearing, provides in pertinent part that "[a]n entry in an account kept in a book or by a card system or *by any other system of keeping accounts, or* a writing or record, whether in the form of an entry in a book or otherwise, made as a memorandum or record of any act, transaction, occurrence or event, shall not be inadmissible in any civil or criminal proceeding as evidence of the facts therein stated because it is transcribed or because it is hearsay or self-serving, if the court finds that the entry, writing or record was made in good faith in the regular course of business and before the beginning of the civil or criminal proceeding aforesaid and that it was the regular course of such business to make such memorandum or record at the time of such act, transaction, occurrence or event or within a reasonable time thereafter . . . . The court, in its discretion . . . may . . . require the party offering the same to produce and offer

The language of § 78 is sufficiently broad to include within its scope a system of keeping records stored on a computer and electronically printed out on demand.[13,14] See *United States* v. *DeGeorgia,* 420 F.2d 889, 893 n.11 (9th Cir. 1969); *Merrick* v. *United States Rubber Co.,* 7 Ariz. App. 433, 436 (1968); *King* v. *State ex rel. Murdock Acceptance Corp.,* 222 So.2d 393, 398 (Miss. 1969); *Transport Indemnity Co.* v. *Seib,* 178 Neb. 253, 258-259 (1965). See also *Bates Block Associates, Inc.* v. *Milady's Shop, Inc.,* 3 Mass. App. Ct. 776, 777 (1975). "The action of the judge in admitting the records in evidence imports a preliminary finding that the conditions imposed by § 78 had been satisfied." *Commonwealth* v. *Baker,* 368 Mass. 58, 84 (1975), and cases cited. *Bates Block Associates, Inc.* v. *Milady's Shop Inc., supra.* The evidence was adequate to support such a finding. The weight to be accorded the evidence is for the finder of fact and not reviewable on appeal.[15] See *Commonwealth* v. *Baker,* 368 Mass. at 84.

---

in evidence the original entry . . . and to call as his witness any person who made the entry . . . or who has personal knowledge of the facts stated in the entry" (emphasis supplied).

[13] It is too late in the day to insist that evidence derived from a computer should be kept from a jury because it is "mysterious and remote from common experience," as the defendants insist. " '[T]he scientific reliability of such machines [electronic computing equipment], in the light of their general use and the general reliance of the business world on them, can scarcely be questioned.' " *King* v. *State ex rel. Murdock Acceptance Corp., infra,* quoting with approval Jones, Evidence § 609 (1968 Supp. to 5th ed.).

[14] So called "negative evidence" that a diligent search has revealed that certain records cannot be found is admissible under G. L. c. 223A, § 14, inserted by St. 1968, c. 760.

[15] We do not believe it necessary to determine whether a special foundation requirement such as that suggested in *United States* v. *DeGeorgia,* 420 F.2d 889, 893 n.11 (9th Cir. 1969), should be imposed on business records stored in a computer. In that case the court stated that the offeror should present evidence of the trustworthiness of the computerized information but noted that everyday reliance on the information was an adequate indicium of trustworthiness. In the present case there was evidence from which routine reliance on the computerized records could be inferred, which could supply an adequate

The fact that the computer printout introduced in evidence was produced from the stored electromagnetic records at a time after "the beginning of the . . . criminal proceeding" does not affect the admissibility of the printout. The electromagnetic record itself was stored in the regular course of business long before this proceeding began; and the translation of the computer language in the stored records to a form usable by the court at a time after the commencement of litigation does not make the printout inadmissible. *Transport Indemnity Co.* v. *Seib,* 178 Neb. at 260. Compare *Greenberg* v. *Weisman,* 345 Mass. 700, 703 (1963); *Bates Block Associates, Inc.* v. *Milady's Shop, Inc.* 3 Mass. App. Ct. at 777.

7. Quartarone argues that the judge erred when he declined, after a full hearing, to suppress identification testimony on the part of Linda Condon, Robert Ricker, and Kenneth Dalton because those identifications were tainted by impermissibly suggestive photographic confrontations.

On or about Sunday, August 10, 1975, the day after the incidents in question, police officers showed Linda Condon an eight by ten inch framed photograph of three individuals, one of whom was Quartarone. This photograph depicted what appears to be an awards ceremony in which two men, Quartarone and another, in police uniforms flanked a nonuniformed man to whom Quartarone was presenting a badge. The other two individuals in the photograph bore little resemblance to Quartarone. This photograph of Quartarone was the only one available to the police at the time. After examining the photograph, Mrs. Condon stated that certain features of Quartarone resembled those of the driver of the car in which she had been kidnapped.

---

basis upon which to find these records trustworthy. If the opponent of computer evidence challenges it on the basis of, for example, the mechanical accuracy of the computer, it remains within the court's discretion under § 78 to require the provision of additional foundation testimony. There was no abuse of discretion here in not requiring such an additional foundation.

After Quartarone's arrest on August 14, police officers showed Mrs. Condon a mug book which contained on different pages two newly taken mug shot photographs of Quartarone, one in black and white, the other in color, together with a large number of other color and black and white photographs. She picked out both pictures of Quartarone as resembling the driver of the car but expressed some uncertainty and requested an opportunity to see him in person.

On August 21 and September 4, Mrs. Condon sat in a police vehicle parked near the district courthouse in Salem. While watching from a distance of approximately twenty feet on the first occasion and fifty feet on the second, she observed and promptly identified Quartarone as he entered and left the courthouse. About fifty other white males, some resembling Quartarone also entered and left the courthouse during both intervals in which she made her identifications. There was nothing about his appearance to indicate that he was anything other than just another individual attending court.

The judge ruled that the photographic identification procedures described above were not impermissibly suggestive. He stated also that Mrs. Condon's identifications were based on her observations of Quartarone during the incident, "[i]ndependent of any police photographic procedures." At trial she testified to the identifications she made from the mug book and from her observations outside the Salem district courthouse and pointed out Quartarone at the defendant's bench. She did not give testimony regarding the initial identification of Quartarone made by means of the eight by ten inch photograph.

The use of that photograph was suggestive but as it was not introduced in evidence, and, as the identifications from the mugbook and from the view at the Salem courthouse were unsuggestive and as the judge found on ample evidence that the identifications of Quartarone had an independent source in the observations of him made during the four and one half hours he was in Mrs. Condon's

presence, there was no error. *Commonwealth* v. *Jackson*, 377 Mass. 319, 331 (1979), and cases cited.

On or about August 11, police officers showed Ricker a set of seven photographs: three of LaRocque, two of Hogan, one of Mrs. Condon, and the group photograph which had been shown initially to Mrs. Condon. Ricker was able to identify each photograph, including that of Quartarone, as that of a participant in the incident which had occurred at the service station.

The judge found on ample evidence that Ricker's identification of Quartarone was based on his knowledge of him from previous encounters. Ricker identified Quartarone at trial but did not testify to the photographic identification procedure. The judge's decision that Ricker's identification testimony was untainted by the photographic procedure was justified. *Commonwealth* v. *Jackson*, 377 Mass. at 331-332, and cases cited.

On or about August 11, police officers showed Dalton the same photographs shown to Ricker. Dalton identified all the photographs as depicting the persons involved in the incident at the service station. The judge found that Dalton's identifications of all defendants, including Quartarone, were based on his observations of them during the incident on August 9. Dalton identified the defendants, including Quartarone, at trial, but did not testify to the photographic identification. The judge was correct in finding Dalton's identification of Quartarone to be independent of the suggestive photographic identification and in refusing to suppress his in-court identification. *Commonwealth* v. *Jackson*, 377 Mass. at 331-332, and cases cited.

8. The judge's refusal to order the production of the results of a polygraph examination conducted by the Commonwealth on Linda Condon was not erroneous. The judge was entitled to believe the Commonwealth's representation that no record of the questions and answers propounded at the examination existed.

9. The denial of Quartarone's motion to sever his trial from that of his codefendants rested within the sound discretion of the judge. *Commonwealth* v. *Seeley*, 167 Mass. 163, 166 (1896). *Commonwealth* v. *Geary*, 352 Mass. 427, 431 (1967). *Commonwealth* v. *Cruz*, 373 Mass. 676, 690 (1977). *Commonwealth* v. *Cepulonis*, 374 Mass. 487, 499 (1978). *Commonwealth* v. *Murphy*, 6 Mass. App. Ct. 335, 341 (1978). Contrast *Commonwealth* v. *Blow*, 362 Mass. 196, 200 (1972).

We do not address the remaining issues which have been briefed as they are not likely to arise at retrial.

The judgments are reversed and the verdicts set aside. A judgment is to be entered for the defendant LaRocque on indictment No. 86122, and the three indictments are to stand for a new trial on the remaining charges.

*So ordered.*