WILLIE ARMSTRONG *v.* STATE OF MARYLAND

[No. 1093, September Term, 1981.]

*Decided May 5, 1982.*

The cause was submitted on briefs to GILBERT, C. J., and MOYLAN and WEANT, JJ.

Submitted by *Alan H. Murrell, Public Defender,* and *Louis P. Willemin, Assistant Public Defender,* for appellant.

Submitted by *Stephen H. Sachs, Attorney General, Philip M. Andrews, Assistant Attorney General, William A. Swisher, State's Attorney for Baltimore City,* and *Charles Kearney, Assistant State's Attorney for Baltimore City,* for appellee.

GILBERT, C. J., delivered the opinion of the Court.

On April 16, 1981, Willie Armstrong was convicted by a jury in the Criminal Court of Baltimore (Levin, J.), of common law mayhem and of statutory maiming (Article 27, § 385). Appellant was committed to the custody of the Division of Correction for ten years for the common law mayhem with a consecutive ten year sentence for the statutory maiming. On appeal he contends the court erred:

1. In excluding certain evidence, and
2. In imposing sentences for both offenses.

The record before us shows that at about 6 p.m. on Saturday, November 1, 1980, when Wilbert Hessel went into the residence of Theodore Betts, he found Betts and the appellant, who occasionally stayed at the Betts' residence, engaged in an argument. Specifically, Hessell said that he heard Betts say to Armstrong:

"I am tired of you messing with me. I will take my shotgun and blow your head off and throw the rest of you out the window."

Subsequently, the appellant pulled out a bottle of acid and poured its contents over the head of Betts. Betts testified:

"[A]fter he poured the stuff over me, I felt it started burning, and that is when I left the chair and I ran to the bathtub to try and run some water over my head but I couldn't get my head far enough down to get it underneath the spigot, and I ran from the bathroom to the kitchen sink and I tried to get some water from there but I couldn't get there because the sink was full of dishes.

> So, then I had to leave the room because the stuff was so strong you couldn't stay up there, and I came downstairs on my own and that is when I asked the young lady to get the ambulance for me, and the officer."

As a result of the acid burns, Betts suffered disfigurement, loss of one eye, and a partial loss of vision in the other eye.

## I. Exclusion of Certain Evidence

The thrust of Armstrong's defense was that he acted in self-defense. According to him, Betts had been bending over, reaching along the floor, and the appellant said he thought Betts was reaching for a weapon.

At the trial, Armstrong attempted to introduce evidence concerning Betts' propensity towards violence.

Testimony disclosed that Betts had been living with a woman identified in the record only as "Annie." It also developed that Annie, unknown to Betts, had been seeing a man named Porter Francis. Although Armstrong knew of the situation involving Annie and Francis, he did not tell Betts. As a result, when Betts found out about appellant's prior knowledge concerning Annie and Francis, Betts held appellant responsible for not telling Betts about it.

Judge Levin permitted appellant to testify that Betts owned a shotgun and a pistol, and that Betts had threatened both Annie and Francis. The instant problem arose when Armstrong wished to introduce evidence about an apparently unrelated incident, but the record is unclear as to the exact identity of the persons involved in that incident who were allegedly threatened by Betts. In any event, Judge Levin refused to allow the testimony.

On appeal, the appellant contends that the refusal to admit the evidence was error.

On the strength of *Williamson v. State,* 25 Md. App. 338, 333 A.2d 653 (1975), we agree. In *Williamson,* we said:

"Contrary to the general reputation rule which prohibits evidence of specific acts, a defendant asserting self-defense may offer evidence of specific acts *of which he was aware* at the time of the killing. Such evidence bears on the reasonableness of his actions:

'It is, of course, generally true that the reputation of the deceased cannot be shown by evidence of specific acts. However, where there is testimony tending to support the theory of self-defense, the presence of such testimony entitles the defendant to the benefit of certain rules of evidence which would not otherwise be available. It is competent for him to prove his knowledge of facts which would have a reasonable tendency to justify his asserted belief as to the existence of a deadly purpose in the overt acts of the deceased. ... *On the issue whether or not the accused had reasonable grounds to believe himself in imminent danger, he may show his knowledge of specific instances of violence on the part of the deceased. Previous acts of violence by the deceased, especially if committed recently, known to the defendant,* might have an even stronger influence on his mind than would be produced by knowledge of the reputation of the deceased for violence.' *Jones v. State,* 182 Md. 653, 659; *Accord, Gunther v. State,* 228 Md. 404, 410; *Barger v. State,* 2 Md. App. 565, 568-569, *cert. denied,* 249 Md. 731. [Emphasis supplied]." 25 Md. App. at 343-344, 333 A.2d at 656.

Our agreement with appellant, however, does not mean we shall reverse, because we think the error to be harmless beyond a reasonable doubt.

The record as a whole shows that the matter of the "inevitable triangle" between Betts, Porter Francis, and Annie, as it bore on Betts' propensity towards violence in

general and towards the appellant in particular was well plotted before the jury. Thus, the error is not grounds for setting aside appellant's conviction. *Dorsey v. State,* 276 Md. 638, 350 A.2d 665 (1976).

## II. Sentencing for Two Offenses

Appellant next claims that:

"The Court erred in imposing separate consecutive sentences for common law and statutory mayhem."

Armstrong was convicted of violations of Md. Ann. Code art. 27, § 384, common law mayhem, and § 385, the so-called "statutory maiming." He was sentenced to consecutive terms of ten years imprisonment. Appellant avers that the intent of the legislature in enacting section 385 was that when, as here, a single act violates both provisions, a separate sentence may not be imposed under each section.

Section 384 prescribes the penalty for common law mayhem and for "tarring and feathering." The act provides:

"Every person, his aiders and abettors, who shall be convicted of the crime of mayhem, or of tarring and feathering, shall be sentenced to the penitentiary for not more than ten years nor less than eighteen months."

The statute, section 385, proscribing maiming declares:

"Every person, his aiders, abettors and counsellors, who shall be convicted of the crime of cutting out or disabling the tongue, putting out an eye, slitting the nose, cutting or biting off the nose, ear or lip, or cutting or biting off or disabling any limb or member of any person, of malice aforethought, with intention in so doing to mark or disfigure such person, shall be guilty of a felony and upon conviction thereof be sentenced to the peniten-

tiary for not less than two nor more than ten years." [1]

The common law crime of mayhem is "the violently depriving another of the use of such of his members as may render him the less able, in fighting, either to defend himself or annoy his adversary." 4 Blackstone, *Commentaries on the Law of England* 1603 (1902); 2 Chitty, *Criminal Law* * 784 (1819); 1 Hawkins P.C. 107 (8th ed. 1824). *See also Commonwealth v. Newell,* 7 Mass. 244 (1810). The cutting off or weakening of the hand, finger, arm, leg, or the putting out of an eye, *inter alia,* constituted mayhem, while cutting off the ear or nose did not since neither the ear nor the nose was included within the ambit of fighting members.

The first statute concerned with mayhem is found in 5 Henry IV, ch. 5. That act related to cutting out the tongues and putting out the eyes of the victims of a crime so that the victim could not "give evidence against those who had ill used them." [2] Later, in 37 Henry VIII, ch. 6, cutting "off the ears of any one of the king's subjects, otherwise than by authority of law, chance, medley, sudden affray or adventure," was made a crime. It was punished by paying "treble damages to the party aggrieved . . . and ten pounds to the king. . . ." [3]

In 1670, the first major change in the law of mayhem occurred. At that time a member of parliament, Sir John Coventry, was attacked by some armed men. Sir John's nose was slit, and he was "so wounded that he was not only disfigured, but his life brought into great danger." Parliament passed what has become known as the "Coventry Act," obviously taking its name from Sir John

---

1. Both sections were added to the code on January 6, 1809, Laws of Maryland, Ch. 138, § 4, and have continued with only minor changes in sentencing. The sole substantive change in what is now section 385 was the substitution of the word "mark" for "maim."

2. Chitty, *Criminal Law* *785 (1819). It should be borne in mind that the literacy rate was extremely low, so that cutting out the tongue and blinding of the victim almost insured that identification of the offender would not be made.

3. Chitty, *supra* *785.

Coventry. The "Coventry Act" made it unlawful to "cut out or disable the tongue, put out an eye, slit the nose, cut off a nose or lip, or cut off or disable any limb or member of any subject of his majesty, with intention in so doing to maim or disfigure. . . ." [4]

Interestingly, "slitting the nose" did not mean that the nostrils had to be perforated. "A wound across the upper part of the nose on a level with the eyes, if it cuts the flesh, and divides the frontal vessels of the forehead, will fix the party by whom it was given, with the guilt of a capital felony.[5]

A significant part of the "Act of Coventry" was the "intent to disfigure." If an accused intended to murder by maiming, he is guilty of the former, not the latter. The intent to maim will not be merged into the design to kill.[6]

Section 385 unmistakably is patterned after the "Act of Coventry." Although many states have modified the common law by statute which makes disfigurement and mayhem one and the same crime,[7] Maryland has not.

Irrespective of the course others may be pursuing, Maryland retains the English law which, as we have seen,

4. The act as quoted in 1 Hawkins, *Pleas of the Crown* (8th ed. 1824), 107, provided:

"By 22 and 23 Car.2.c.1 it is enacted, 'That if any person shall, on 'purpose and of malice forethought, and by lying in wait, 'unlawfully cut out or disable the tongue, put out an eye, slit the 'nose, cut off a nose or lip, or cut off or disable any limb or member of 'any subject of his majesty, with intention in so doing to maim or 'disfigure, in any the manners beforementioned, such his majesty's 'subjects, that then and in every such case, the person or persons so 'offending, their counsellors, aiders, and abbettors, knowing of, and 'privy to the offense as aforesaid, shall be and are by the said statute 'declared to be felons, and shall suffer death as in cases of felony 'without benefit of clergy.' "

5. Chitty, *supra* * 785. *See also* 1 Leach, Crown Law 55 (4th ed. 1815).
6. *Ibid* at *786.
7. *See e.g.,* People v. Green, 59 Cal. App. 3d 1, 130 Cal. Rptr. 318 (1976); Cal. Penal Code § 203; Kitchens v. State, 80 Ga. 810, 7 S.E. 209 (1888); State v. Foster, 156 La. 891, 101 So. 255 (1924) (under a statute substantially identical to § 385); Commonwealth v. Hogan, 387 N.E.2d 158 (Mass. App. 1979); Mass. G. L. c. 265, § 14; Lamb v. Cree, 466 P.2d 660 (Nev. 1970); Nev. Rev. Stat. § 200.280. *United States v. Cook,* 462 F.2d 301 (D.C. Cir. 1972); (Mayhem as dependent on part of body injured and extent of injury) Annot. 16 ALR 955, 957 (1922).

included the 1670 "Act of Coventry," as an offense separate and distinct from common law mayhem.[8]

Notwithstanding that, this State has two acts that seemingly punish, in this case, the same misdeed, that is, throwing acid upon another person. Had the victim not been blinded in one eye, there can be no doubt that appellant would have been charged with the statutory crime, or put another way, violating Maryland's version of the "Act of Coventry." Nevertheless, the fact that Betts was blinded in one eye constitutes a violation of the common law. Blinding of the eye is also a violation of the statute. If the record were clear as to any specific act of disfigurement and clear that the jury concluded the disfigurement was a violation of section 385 and the blinding of one eye was a violation of the common law, separate convictions might stand. The record, however, is not clear.

Each count of the criminal information charged that Armstrong assaulted Betts by "burning the chest, hand area, and eyes." The count charging a common law violation went on to asseverate that Betts "was rendered less able, in fighting, to defend (himself/herself) and to annoy (his) adversary. . . ." The count that was grounded on the statute averred that Armstrong performed the act "with intent then and there to mark and disfigure" Betts. Were it not for the fact that the common law count alleges that Betts was "rendered less able, in fighting, to defend himself," the charges would be basically the same.

There was evidence from which the jury could conclude that Armstrong blinded Betts in one eye and thereby rendered Betts less able to defend himself in fighting.

That evidence clearly established a violation of the "Act of Coventry." The difficulty is that in order for the jury to convict Armstrong of the common law offense of mayhem, it had to rely upon the truthfulness of the same evidence.

---

8. According to Chitty *784, at ancient law those adjudged guilty of mayhem were sentenced to suffer the same injury as that they had inflicted upon the victim. The "lex talionis of Moses" was literally an "eye for eye, a leg for a leg."

The distinction between common law mayhem and statutory maiming is still viable in Maryland, but that fact does not mean that a person may be convicted of both offenses when *"all elements of one offense are present in the other, the offenses are deemed to be the same. . . ."Newton v. State,* 280 Md. 260, 266, 373 A.2d 262, 265 (1977); *Thomas v. State,* 277 Md. 257, 267, 353 A.2d 240, 246 (1976); *Newton* and *Thomas* prevent the conviction of Armstrong for both the common law and the statutory crimes. Under the facts of this case, the offenses merged under *Newton* on double jeopardy grounds. Accordingly, we vacate the conviction for common law mayhem.

> *Judgment on count one vacated.*
> *Judgment on count two affirmed.*
> *One-half the costs to be paid by appellant.*
> *One-half the costs not to be reallocated. Md. Rule 1082 f.*