COMMONWEALTH vs. SAM ANDREW JACKSON, JR.

Worcester. October 3, 1978. — February 15, 1979.

Present: HENNESSEY, C.J., QUIRICO, BRAUCHER, WILKINS, & ABRAMS, JJ.

*Admissions and Confessions. Constitutional Law*, Admissions and confessions. *Identification.*

Where a defendant, while in police custody, asserted his right to remain silent, but later agreed to make a statement after the police continued to converse with him and made an intentionally false statement to him to the effect that his girl friend had given the police a statement which implicated her in the crime, the defendant did not make an intelligent, voluntary, and knowing waiver of his Miranda rights, and his statement should have been suppressed. [321-329]

Evidence at a criminal trial that a witness had an opportunity to observe the defendant in a well-lighted area, that he saw the defendant for more than five minutes, and that during that time he had a face to face conversation with the defendant was sufficient to warrant a finding that the witness's in-court identification of the defendant had a source independent of a prejudicial pretrial photographic procedure. [329-332]

INDICTMENT found and returned in the Superior Court on January 10, 1977.

Pretrial motions to suppress evidence were heard by *Cross*, J., and the case was tried before him.

After review was sought in the Appeals Court, the Supreme Judicial Court, on its own initiative, ordered direct appellate review.

*Conrad W. Fisher* for the defendant.

*Daniel F. Toomey*, Assistant District Attorney, for the Commonwealth.

ABRAMS, J. Convicted of murder in the second degree, the defendant, Sam Andrew Jackson, Jr., appeals to this court pursuant to G. L. c. 278, §§ 33A-33G. Although

Jackson argues numerous assignments of error, we concern ourselves primarily with one ground asserted as error: the denial of a motion to suppress a statement made by Jackson to police because the police did not "scrupulously honor" Jackson's right to cut off questioning, and because the use of deceit "tricked" Jackson into a waiver of his constitutional rights. We reverse the conviction and remand for a new trial. We also address the issue of identification which may recur at trial.

We summarize the facts. On September 9, 1976, at approximately 10:30 P.M., Jackson was seen with a young woman and Dominic C. Gracia (Gracia) at the Holiday Inn in Worcester. The group entered the motel and went into the lounge. The motel's security guard, Richard Chestna, then saw Jackson and Gracia come from the lounge through the lobby to the front desk. Chestna observed Gracia and Jackson at the desk. Gracia sought to obtain cash from the clerk by charging the request against his credit card.

While the two men were at the desk in the lobby, the young woman left the motel. Chestna saw the young woman in the motel's parking lot, and he chatted with her. She told Chestna she was waiting for her boy friend.

Chestna returned to the lobby. After a few minutes Gracia's male companion Jackson came over to Chestna, and the two had a conversation. Jackson, who was identified by Chestna at trial as the man with Gracia and the man with whom he spoke, asked about his girl friend. Jackson described the girl and Chestna told him that she was in the parking lot. Chestna said the young woman wore a "red bandana." At approximately 11 P.M. Jackson went toward the motel's side door.

At 1 A.M. a security guard for another building found Gracia unconscious in the parking lot across the street from the motel. Gracia was taken to the hospital where he died from "a blow to the head which fractured the skull, subdural hematoma." Gracia had apparently been lying in the parking lot since approximately 11 P.M.

The next day Jackson was seen in possession of Gracia's wallet, his watch and his rings. Jackson sold one of the rings and the watch to a man who knew him personally. He gave the wallet and another ring to a friend.

As a result of a search pursuant to a warrant, police found in Jackson's apartment a red bandana similar to the one worn by the young woman. On September 12, 1976, Jackson and the young woman were questioned by the police and released.

Police learned that Jackson told some people that he (Jackson) "had hit the guy down at the Goodwill, Holiday Inn."[1]

Jackson was arrested by police on September 15. Jackson said that he and his girl friend had been with Gracia at the Holiday Inn. He also said that before leaving the motel he had a conversation with the motel security guard about his girl friend.

Jackson admitted to police that he punched Gracia and knocked him down but denied that he intended to kill him. Jackson also admitted that after knocking Gracia down he took Gracia's wallet and two rings.

Jackson was convicted of murder in the second degree and sentenced to life imprisonment.[2]

1. *The Motion to Suppress Statements Made to Police.*

Prior to trial, the defendant moved to suppress statements which he made to police while in custody on September 15, 1976. He claims that police obtained his statements in violation of rights protected by *Miranda* v. *Arizona*, 384 U.S. 436 (1966), and that he did not knowingly, intelligently and voluntarily waive his privilege against self-incrimination. After a hearing, the trial judge found that the "defendant waived his right to silence and made a statement inculpating himself intelligently, voluntarily, and knowingly." The judge denied

---

[1] Jackson acted as his own counsel during a part of the trial and elicited this information.

[2] The jury acquitted Jackson on an indictment alleging robbery.

the defendant's motion to suppress his statement. We conclude that the statement should have been suppressed. Accordingly, we reverse and remand for a new trial.

We summarize the facts relating to the defendant's motion. On September 15 the police decided to arrest Jackson and his fifteen-year old girl friend. Two officers were ordered to bring the girl and her mother to the station. Two other officers were dispatched to arrest Jackson. The officers ordered to bring the girl to the station went to the residence of the girl's mother where the girl was arrested. Jackson was present at the arrest, but the officers did not recognize him. Jackson asked if he could accompany his girl friend and her mother to the station. The officers agreed.

When the group arrived at the police station at approximately 6:30 P.M., other officers recognized Jackson and arrested him. Jackson was separated from the girl and her mother and placed in an interrogation room. A police officer[3] told Jackson the crime for which he was arrested and read him the Miranda warnings. Jackson replied that he "didn't have anything to say." Jackson asked permission to call his parole officer.

Next the police officer and Jackson went to a telephone where the police officer tried at least four or five different numbers in an effort to reach the parole officer. After approximately twenty minutes of attempting to call the parole officer, Jackson and the police officer returned to the interrogation room. The police officer left the room and again tried to contact the parole officer a few more times, but was unsuccessful.[4] The police officer then re-

---

[3] The same officer had questioned Jackson on September 12. At that time Jackson was read the Miranda warnings and made no statement. Jackson was released later that evening.

[4] We do not decide whether by requesting to see his parole officer the defendant "no less invoked the protection against self-incrimination than if he asked for the presence of an attorney." *In re Michael C.,* 21 Cal. 3d 471, 477, cert. granted sub nom. *Fare* v. *Michael C.,* 439 U.S.

turned to the interrogation room and found himself alone with Jackson for approximately ten minutes. What transpired during this ten-minute period is a matter of dispute and the judge made no subsidiary findings on this issue.

Counsel for the defendant sought to elicit from the police officer that the officer had in some form of words made a promise of leniency to Jackson while the two men were alone in the interrogation room. The officer's responses are best characterized as equivocal. The assistant district attorney attempted to clarify what occurred by eliciting from the police officer exactly what the police officer had said to Jackson.

In substance, the officer testified that he told Jackson that the officer knew that Jackson "had done it" (i.e. the crime); that the officer knew that Jackson "had committed the act"; that the officer knew Jackson "had committed a crime that occurred"; and that the officer "had good information that [Jackson] did it." The officer also recalled saying in substance "the more [I] checked the more the case is pointing to you [Jackson] as the man that did it." The officer informed Jackson that the police "had a watch and ring" and that the evidence "pointed to" Jackson. Jackson again said that he did not want to make a statement and the officer left the room.

We assume that the judge accepted as true the Commonwealth's version of what the police officer said to Jackson since the judge found that the defendant was not "threatened or cajoled into waiving his rights." We therefore accept the officer's version of the conversation and thus we do not discuss any allegation that there was a promise of leniency.[5]

925 (1978) (probation officer). Nor do we consider the impact, if any, of such a request on the decision to remain silent and any later decision to make a statement. See *Commonwealth* v. *Watkins*, 375 Mass. 472, 483-484 (1978).

[5] It is well established that a confession "must not be ... obtained by any direct or implied promises, however slight." *Malloy* v. *Hogan*,

Moments later, at approximately 7 P.M., another police officer entered the interrogation room. The judge found that this officer had been with Jackson's girl friend prior to coming into the interrogation room. The officer told Jackson that his (Jackson's) girl friend had given the police a statement which implicated her in the crime. It is not disputed that this statement was made to Jackson, that at the time it was made it was false, and that the officer knew it was false. As soon as the false statement was made to Jackson he told police he would give them a statement.

After Jackson agreed to make a statement, the police had a third officer read the Miranda warnings to Jackson. Jackson said that he understood his rights and "wanted to give a statement about what happened," but before making the statement he wanted to talk to his girl friend. The police agreed and brought the girl and her mother into the interrogation room. The police left the room, and Jackson was alone with the girl and her mother.

Ten minutes later, the police returned and took the women out of the room. Jackson then made a statement which was typed and read to him. Jackson signed the statement. The typed statement indicates that the statement began at 7:15 P.M.

The statement signed by Jackson recites the Miranda warnings. Moreover, it states that Jackson was told he "could exercise these rights and not answer any questions or make any statements," and that Jackson understood these rights and gave the "statement of [his] own free will." The judge concluded in part that there "is no credible evidence that the defendant was threatened or cajoled into waiving his rights."[6]

---

378 U.S. 1, 7 (1964), quoting from *Bram* v. *United States*, 168 U.S. 532, 542-543 (1897). See *Commonwealth* v. *Fournier*, 372 Mass. 346, 348 (1977); *Commonwealth* v. *Makarewicz*, 333 Mass. 575, 585 (1956); *Commonwealth* v. *Chabbock*, 1 Mass. 143, 144 (1804).

[6] The remaining conclusions of the judge are discussed *infra* at 328-329.

We start by repeating that a judge's finding of waiver is "entitled to substantial deference by this court." *Commonwealth* v. *Tabor*, 376 Mass. 811, 822 (1978), quoting from *Commonwealth* v. *White*, 374 Mass. 132, 138 (1977), aff'd, 439 U.S. 280 (1978). Further, we will not disturb a judge's subsidiary findings where they are warranted by the evidence. However, "where the ultimate findings and rulings bear on issues of constitutional dimension, they are open for review. Our appellate function requires that we make our own independent determination on the correctness of the judge's 'application of constitutional principles to the facts as found.' " *Commonwealth* v. *Haas*, 373 Mass. 545, 550 (1977). *Commonwealth* v. *Murphy*, 362 Mass. 542, 550-551 (1972) (Hennessey, J., concurring).

The determination of the constitutional principles applicable begins with *Miranda*. Since the defendant's statement was made after he was given his Miranda warnings and was made in the absence of counsel, the admissibility of the defendant's statement depends on whether his waiver of his constitutional rights was made "voluntarily, knowingly and intelligently." *Miranda* v. *Arizona, supra* at 444. Moreover, "the admissibility of statements obtained after the person in custody has decided to remain silent depends under *Miranda* on whether his 'right to cut off questioning' was 'scrupulously honored.' " *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975). See *Commonwealth* v. *Taylor*, 374 Mass. 426, 432-433 (1978).

The Commonwealth claims that Jackson's right to "cut-off questioning was 'scrupulously honored' . . . [because the officer] immediately ceased his questioning when Mr. Jackson indicated he wished to remain silent." After Jackson chose to remain silent, the police properly attempted to telephone his parole officer. However, once that attempt failed, the officer began to talk with Jackson, telling him that the evidence "pointed to him," that they knew he "did it," that the police had the "ring" and the "watch" and that in the officer's view the police "had good information that he did it." Jackson still refused to

make a statement, and the officer left. Then the police made an intentionally false statement to Jackson, and immediately thereafter Jackson agreed to give a statement.

We believe that these efforts by police to elicit a statement from Jackson show a deliberate decision on the part of the police to interrogate Jackson in spite of his desire to remain silent. In the thirty minutes which elapsed from Jackson's arrival and arrest at 6:30 P.M. to the time shortly after 7 P.M. when Jackson agreed to give a statement, Jackson had told police at least twice that he did not want to make a statement. Nevertheless, police continued to converse with Jackson. Therefore, we are unable to agree with the Commonwealth that Jackson's "right to 'cut off questioning' was 'scrupulously honored.' " See *Michigan* v. *Mosley*, 423 U.S. 96, 104 (1975).

Next the Commonwealth argues that "[i]nterrogation did not resume until after Mr. Jackson indicated his willingness to talk." The Commonwealth claims that after the defendant asserted his right to remain silent, the police asked him no further questions. Thus the Commonwealth argues that Jackson's right to remain silent was respected by the police until Jackson indicated a willingness to talk with police after making a "knowing, intelligent and voluntary waiver." We disagree.

The *Miranda* decision is, in large measure, specifically aimed at establishing proper safeguards to deter custodial police interrogation practices designed to impair a defendant's capacity to remain silent. *Miranda* v. *Arizona*, 384 U.S. at 467. Although the police may have asked Jackson no further questions, the statements made to Jackson by the police officer were, in our view, designed to undermine Jackson's decision to remain silent and to persuade him to confess. We think the police conduct here was contrary to the letter and the spirit of the *Miranda* decision. See *Commonwealth* v. *Taylor*, 374 Mass. 426, 434 (1978); *People* v. *Gibson*, 55 Ill. App. 3d 929,

936-937 (1977). See also *Michigan* v. *Mosley*, 423 U.S. at 105-106.[7]

We need not decide whether the officer's conduct in continuing to talk to Jackson after he (Jackson) clearly invoked the right to remain silent was impermissible, because Jackson remained silent until the police resorted to trickery. See *Miranda* v. *Arizona*, 384 U.S. at 476. While the officer's tactics alone in some circumstances might be sufficient to invalidate a waiver, see *Commonwealth* v. *Taylor*, *supra* at 430, 433-434, in this case, the police "tricked" Jackson into waiving his right to remain silent. Prior to the time that the misrepresentation was made to Jackson, he had clearly relied on his right to remain silent and had withstood questioning on September 12 as well as September 15. We are, therefore, unable to conclude that the false statement did not "trick" Jackson into a waiver of his rights.

In concluding that the defendant was not "tricked" into a waiver of his rights, the judge focused solely on the false statement made by the police officer. The judge found Jackson's waiver of his rights voluntary because "the untruthful statement did not pertain to the defendant" and because "the defendant was given a reasonable time to confer with his girlfriend in private as far as the police were concerned." The judge reasoned that Jackson was not prevented from inquiring into the truthfulness of the statement, and therefore Jackson's waiver was made "intelligently, voluntarily and knowingly."

---

[7] Unlike *Michigan* v. *Mosley*, 423 U.S. 96 (1975), where the Supreme Court held the resumption of questioning permissible, this is a case "where the police failed to honor a decision of a person in custody to cut off questioning . . . by persisting in repeated efforts to wear down his resistance and make him change his mind." *Id.* at 105-106. By contrast, we think that after a change in circumstances, as for example where an accomplice actually makes an inculpatory statement to police, it is permissible for the police to make this fact known to a suspect who has earlier invoked his right to remain silent, so that the suspect may make a realistic evaluation of his position. See *id.* at 104-105. Accord, *United States* v. *Mearns*, 443 F. Supp. 1244, 1253 (D. Del. 1978). See also *Hill* v. *Whealon*, 490 F.2d 629, 639 (6th Cir. 1974); *United States* v. *Collins*, 462 F.2d 792, 801-802 (2d Cir.) (en banc), cert. denied, 409 U.S. 988 (1972); *McDougle* v. *State*, 355 So. 2d 1386, 1388 (Miss. 1978).

We agree with the judge that the false statement made by the police officer did not pertain to the defendant. This, of course, is literally true but it is unclear how his girl friend could make a statement which did not at least indirectly implicate Jackson. A red kerchief or bandana similar to the one worn by the female allegedly involved in the incident was found in Jackson's apartment, and on September 12 and on September 15 when Jackson and his girl friend were brought to the police station for questioning the police found them together at the home of the girl friend and her mother. The inference that Jackson was likely to draw from the false statement (and probably the inference the police wanted him to draw) was that if his girl friend mentioned a male companion in her statement, that was sufficient to connect Jackson with the crime. Therefore, we do not think that the fact that the false statement pertained only to the girl friend materially assists the Commonwealth on the issue of the voluntariness of Jackson's waiver.[8]

We also agree with the judge that once the defendant was permitted to meet with his girl friend "[h]e was not prevented from inquiring into the truthfulness of the statement." However, assuming that Jackson asked his girl friend whether or not she had told the police anything, even her denial cannot be said to completely vitiate the impact of the misrepresentation made by the police officer.

If the girl denied making a statement, then the defendant was faced with weighing the credibility of his fifteen

---

[8] While we have here considered the false statement as being relevant but not conclusive on the issue of waiver, we expressly disapprove of the tactics of making deliberate and intentionally false statements to suspects in an effort to obtain a statement. Since *Miranda* such tactics cast doubt on the issue of whether a waiver is knowing, intelligent and voluntary, *Miranda* v. *Arizona,* 384 U.S. 436, 476 (1966), as well as on the voluntariness of confessions. See *Schmidt* v. *Hewitt,* 573 F.2d 794, 801 (3d Cir. 1978); *Swaney* v. *State,*      Ind. App.      (1978) (378 N.E.2d 554, 555-556). Compare *Frazier* v. *Cupp,* 394 U.S. 731, 739 (1969), with *Commonwealth* v. *Green,* 302 Mass. 547, 551 (1939).

year old girl friend against the credibility of the police officer who made the false statement. At the very least, the misrepresentation by police created "[a] doubt . . . as to whether [the girl] had talked" regardless of her answer. F.E. Inbau & J.E. Reid, Criminal Interrogation and Confessions 86-87 (1967).

We are unable to agree with the judge's ultimate conclusions that "[t]here is no credible evidence that the defendant was threatened or cajoled into waiving his rights" and that "the defendant was not tricked into a waiver." We think that where police pursue a course of conduct aimed at improperly convincing a defendant to relinquish the right to remain silent, the Commonwealth has neither "scrupulously honored" that right nor has it sustained its burden[9] of showing a knowing, intelligent and voluntary waiver of that right. *Miranda* v. *Arizona*, 384 U.S. at 473-475. See *Michigan* v. *Mosley*, 423 U.S. at 104. In the absence of a valid waiver, Jackson's statements to police must be suppressed. See *Commonwealth* v. *Taylor*, 374 Mass. 426, 436 (1978).

2. *Motion to Suppress Identification Testimony.*

Jackson asserts that an in-court identification of him by the security guard from the Holiday Inn should have been suppressed as it was the product of a constitutionally impermissible pretrial identification procedure. Specifically, he alleges that Chestna was shown only pictures of Jackson, and that even so Chestna was unable to make a photographic identification. Therefore, Jackson claims that Chestna's in-court identification must be the

---

[9] We do not decide whether the Commonwealth may meet this burden by a "preponderance of the evidence standard . . . or whether a more exacting standard, such as beyond a reasonable doubt, is applicable to the demonstration of a valid waiver." *Commonwealth* v. *Hooks*, 375 Mass. 284, 288 n.1 (1978). In this case, assuming that the Commonwealth could meet its burden by showing a valid waiver by the preponderance of the evidence, the Commonwealth has failed to meet such a burden. Accord, *Commonwealth* v. *Hosey*, 368 Mass. 571, 577 n.2 (1975).

result of the suggestive photographic procedure. The judge, however, concluded that Chestna's in-court identification was "not tainted" and had an "independent source."

We summarize the judge's findings. On September 9, the motel security guard, one Chestna, was on duty from 10 P.M. to 6 A.M. The witness was also employed as a police officer for the town of Thompson, Connecticut.

Shortly after 10 P.M. on September 9, Chestna observed Gracia, "whom he knew, and a black man ... emerge from the cocktail lounge and go to the front desk. The lobby was fairly well lighted." Chestna could see part of the defendant's face at the time the two men were at the clerk's desk and he watched until both men returned to the lounge.

Thereafter Chestna saw a girl wearing a red bandana leave the lobby. As Chestna made his rounds checking the exterior of the building, he saw the same girl standing in the motel parking lot, and had a conversation with her.

Approximately thirty minutes later, the man whom Chestna had seen with Gracia returned to the lobby. The man approached Chestna and asked whether Chestna had seen his (the man's) girl friend. Chestna asked the man to describe the girl. The man did so, and Chestna told him that the girl was waiting in the parking lot.

On September 13,[10] police showed photographs of Jackson to Chestna, but Chestna was unable to make a positive identification of Jackson from the pictures. At Jackson's request, Chestna was summoned to testify at the hearing on the motion to suppress. At the hearing he identified Jackson as the man with Gracia and as the man to whom he had spoken on the evening of September 9.

---

[10] At trial Chestna said that he had described Jackson to the police on September 13 as "about five ten to about six feet," "[a]round 180 pounds," "[s]hort hair," and "[d]ark complexion." Chestna also described Jackson's clothing as light colored pants and suit jacket.

The judge found that Chestna "saw [the defendant] in excess of five minutes on the evening of September 9, 1976 and engaged in a face to face conversation with him." The judge then ruled that Chestna would be permitted to make an in-court identification of Jackson at trial, since the pretrial photographic procedures did not "taint" Chestna's in-court identification. In essence, the judge found that the in-court identification had an "independent source." *(*

To determine whether Chestna's identification of the defendant at trial would be permissible, the judge applied the standards derived from *Simmons* v. *United States,* 390 U.S. 377 (1968), and the cases of *United States* v. *Wade,* 388 U.S. 218 (1967), *Gilbert* v. *California,* 388 U.S. 263 (1967), and *Stovall* v. *Denno,* 388 U.S. 293 (1967). These cases require, in substance, that if a judge finds an identification procedure impermissibly suggestive, any later identification "must have an independent source."[11] *Commonwealth* v. *Botelho,* 369 Mass. 860, 866 (1976).

The evidence amply supports the fact that the witness had an opportunity to observe the defendant in a well-lighted area. The evidence also supports the fact that the witness saw the defendant for more than five minutes, and during that time he had a face to face conversation with the defendant.

These facts, in turn, justify the judge's finding that the in-court identification had a source independent of the pretrial photographic procedure.[12] See *Commonwealth* v.

---

[11] The Commonwealth claims that the "independent source" standard is a stricter standard than that recently espoused by the Supreme Court in *Manson* v. *Brathwaite,* 432 U.S. 98, 114 (1977), which emphasizes the reliability of a pretrial identification in all the circumstances. Compare *Commonwealth* v. *Botelho,* 369 Mass. 860, 870-873 (1976). We need not determine whether the *Manson* case applies retroactively to an in-court identification made before the *Manson* decision, since we find no error in the judge's ruling. Cf. *Commonwealth* v. *Jones,* 375 Mass. 349, 352-355 (1978).

[12] On appeal, the defendant argues that the identification should be suppressed because, at the time the witness identified the defendant,

*Botelho, supra* at 868; *Commonwealth* v. *Murphy,* 362 Mass. 542, 548-549 (1972). Accord, *Simmons* v. *United States,* 390 U.S. 377, 384 (1968). Accepting the judge's subsidiary findings because they are supported by substantial evidence, we agree with his conclusion that the in-court identification was not "tainted" by the pretrial display of the defendant's photographs.

While we find no error in the judge's ruling, we think photographs of only one person should not be shown to witnesses in the absence of exigent circumstances. Although there is no per se rule of exclusion where a single photograph is shown, "a one-to-one confrontation, whether in person or by photograph, is disfavored." *Commonwealth* v. *Nolin,* 373 Mass. 45, 51 (1977), and cases cited. See *Nassar* v. *Vinzant,* 519 F.2d 798, 801 (1st Cir.), cert. denied, 423 U.S. 898 (1975). See also *Commonwealth* v. *Marini,* 375 Mass. 510, 517 (1978).[13]

Jackson's placement in the court room was unduly suggestive. We cannot review this allegation because counsel did not move "for an in-court lineup or to seat the defendant in the court room audience," *Commonwealth* v. *Jones,* 375 Mass. 349, 358 (1978), quoting from *Commonwealth* v. *Jones,* 362 Mass. 497, 500-501 (1972). See *Commonwealth* v. *Pearsall,* 370 Mass. 413, 415-416 (1976); *Commonwealth* v. *Core,* 370 Mass. 369, 372-373 (1976); *Commonwealth* v. *Bumpus,* 362 Mass. 672, 680 (1972), judgment vacated and remanded on other grounds, 411 U.S. 945 (1973), aff'd on rehearing, 365 Mass. 66 (1974).

[13] To the extent that the defendant appears to argue that the in-court identification by the witness Chestna must be suppressed because Jackson was arrested without probable cause, this claim is without merit as the witness identified Jackson at trial only and not at a pretrial identification procedure based on the arrest.

In any event, at the time Jackson was arrested police knew that one Goff (Jackson's roommate) had told his (Goff's) brother that Jackson said he (Jackson) "had hit the guy down at the Goodwill, Holiday Inn." Police also knew that after the killing Jackson was in possession of Gracia's wallet, credit card, watch and rings.

Jackson had been identified as the man who sold one of Gracia's rings by a witness who knew him personally. Moreover, a search of Jackson's apartment on September 12 had uncovered a red kerchief or bandana which matched the description of that worn by the female allegedly involved in the incident. These facts were more than ample to give the police probable cause to arrest the defendant on September

3. *Other Issues.*

The other issues argued by the defendant do not appear likely to recur at a retrial. Therefore, we do not address them in detail except to say that we have read the entire transcript and there is no error in any of the judge's rulings other than the motion to suppress Jackson's statement.

Accordingly, the judgment of the Superior Court is reversed, the verdict set aside, and the case is remanded for a new trial.

*So ordered.*

---

15. See *Commonwealth* v. *Haas,* 373 Mass. 545, 555 (1977). See also *Commonwealth* v. *Cruz,* 373 Mass. 676, 684 (1977); *Commonwealth* v. *Haas, supra* at 567-568 (Hennessey, C.J., dissenting).