COMMONWEALTH *vs.* JOYCE J. MAGEE.

Middlesex. April 3, 1996. - August 1, 1996.

Present: LIACOS, C.J., WILKINS, LYNCH, O'CONNOR, & GREANEY, JJ.

*Constitutional Law,* Admissions and confessions, Waiver of constitutional rights, Assistance of counsel. *Waiver. Evidence,* Admissions and confessions. *Practice, Criminal,* Voluntariness of confession, Assistance of counsel.

In a criminal case, the judge's findings that the defendant was in police custody when she made incriminating statements [385-386], that the Commonwealth failed to demonstrate that the defendant's waiver of her Miranda rights was voluntary [386-387], and that the defendant's statements were not voluntary [387-389] were supported by the record: the judge correctly ordered suppressed the statements made by the defendant [389].

INDICTMENT found and returned in the Superior Court Department on July 14, 1994.

A motion to suppress evidence was heard by *Regina L. Quinlan,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Greaney,* J., in the Supreme Judicial Court for the county of Suffolk and the appeal was reported by him.

*Martin F. Murphy,* Assistant District Attorney, for the Commonwealth.

*Tamar Augst (Geoffrey Packard* with her) for the defendant.

LYNCH, J. This case is before the court on an interlocutory appeal from an order by a Superior Court judge suppressing certain statements made by the defendant, Joyce J. Magee, to law enforcement officials. After hearing testimony from several witnesses, the judge ordered the statements suppressed on the grounds that: (1) the defendant's waiver of her Miranda rights was not valid and (2) the statements were not voluntary. The Commonwealth was granted leave to appeal from the order of the Superior Court, pursuant to Mass. R.

Crim. P. 15 (b) (2), 378 Mass. 882 (1979). A single justice reported the appeal to the full court. We affirm.

1. *Facts.* We summarize the motion judge's findings of fact: Late in the evening of July 3, 1994, the defendant and her boy friend, Roger Montmarquet, began a heated and emotional discussion that lasted into the morning hours. In the course of the discussion, the defendant became upset and sobbed repeatedly. She told Montmarquet that she needed help and that, if Montmarquet knew what she had done, he would not want to be with her. Montmarquet assumed the defendant was referring to the death of her twenty-eight day old son in 1988, which she had referred to on occasion.[1] At about 4 A.M. on July 4, the two decided to go to the police station in Dracut to get help in having the defendant committed to a mental health facility.[2]

When they arrived at the police station at about 5 A.M., Montmarquet told Dracut police Captain Thomas McNiff that the defendant needed help and needed to talk to someone about the death of her baby in 1988. At the time, it had been ruled a SIDS death, Montmarquet told the police, but there may have been more to it.

McNiff asked the defendant whether she wanted to talk; the defendant nodded her head.[3] McNiff brought the defendant to a small office in the police station[4]; at the defendant's request, Montmarquet joined her there. McNiff read the defendant her Miranda rights and she orally agreed to waive them. When advised of her right to have an attorney present, the defendant responded that she did not know any attorney to call or how to get one to the police station at that hour. McNiff responded by stating that she could call anyone she wished.

McNiff then questioned the defendant. During the inter-

---

[1]At the time, the death had been attributed to sudden infant death syndrome (SIDS).

[2]They decided to go to Dracut instead of Lowell because the defendant had lived in Dracut in 1988 when her child had died.

[3]To the extent that the judge found that the defendant explicitly stated that she did not want to talk with the police, that finding is not supported by the record.

[4]Although the judge made no findings regarding the specific characteristics of the room, the undisputed testimony of one of the officers indicates that it was twelve feet by twenty feet in area and contained several desks and chairs, and at least one window.

view, the defendant repeatedly asked for help and to be committed. McNiff understood her to be asking for the help of a trained mental health professional. In response to these requests, McNiff told the defendant that she would get help if she explained what she needed and what the problem was. In the course of the questioning, the defendant spoke about the circumstances leading up to the death of her son in 1988, and she indicated that it may not have been caused by SIDS. When pressed for the details of her involvement in the child's death, the defendant repeatedly refused to answer McNiff's questions. She said that, if she told the police what she thought had happened, they would arrest her. Throughout the interview with McNiff, the defendant was exhausted, emotionally distraught, and disheveled, and her responses to questions were interrupted by periods of sobbing and shaking.

At about 5:50 A.M., Dracut Detective James Wagner arrived to continue the questioning. He was informed that the defendant was seeking help and that she was upset about the death of her son in 1988. Wagner administered a second set of Miranda warnings at about 6 A.M.; at that time, the defendant signed a form acknowledging that she waived her rights. Wagner conducted his interview of the defendant in the same room where McNiff's interview had occurred. Present were the defendant, Montmarquet, McNiff, and Wagner. Wagner's questioning focused on the defendant's role in her son's death. The defendant continued to refuse to answer questions about her direct involvement. She also continued to ask for help in being involuntarily committed to a mental health facility. She continued to look distraught and disheveled, with periods of sobbing and shaking.

After about twenty-five more minutes of questioning, McNiff and Wagner told the defendant they had called for assistance, and asked the defendant and Montmarquet to wait until the additional people arrived. The defendant and Montmarquet were offered food and coffee, and accepted coffee. At about 9 A.M., State Trooper Owen Boyle arrived, along with an assistant district attorney.[5] Boyle was briefed by McNiff and Wagner about the morning's events and the defendant's statements regarding the death of her son and her request for help.

---

[5]The judge found that the assistant district attorney did not participate in the questioning of the defendant.

During the next two hours, Boyle questioned the defendant regarding the death of her son. The questioning took place in the same office as the prior interviews, with Montmarquet, McNiff, and Wagner present. In response to the defendant's requests for help, Boyle said he would help with her problem, but that he needed more information before he could do so. During the interview with Boyle, the defendant was tense and distraught, although her forceful crying had stopped.

Miranda warnings were administered at some time after Boyle began questioning the defendant. During the questioning, the defendant eventually stated that she believed she had suffocated her child. Boyle typed the substance of the statement onto his computer and printed it out for the defendant to sign. She looked over the three pages, made minor corrections and then signed the statement. By then it was noon. After the defendant signed the statement, she was told that arrangements had been made for a mental health evaluation at Solomon Mental Health Center in Lowell (Solomon). Montmarquet then drove the defendant to Solomon, with police following.

The duty nurse at Solomon noted that the defendant was distraught and disheveled on arrival, that her eyes were red, indicating prolonged crying, that she was crying, at times forcefully, and was suffering from lack of sleep. The defendant told the nurse that she had no memory of actually asphyxiating her son but that she felt responsible for his death. Based on the defendant's extreme level of distress and her suicidal ideation, she was involuntarily committed to Anna Jacques Hospital in Newburyport. A few days later, Dracut police arrested her there, and charged her with the murder of her son.

2. *Standard of review.* The motion judge granted the defendant's motion to suppress her statements to the police principally because the Commonwealth failed to sustain its heavy burden that the defendant's waiver of her Miranda rights was voluntary and that the defendant's statements were voluntary. In reviewing the judge's action, we "accept[ ] the judge's subsidiary findings of fact absent clear error, give[ ] substantial deference to the judge's ultimate findings and conclusions of law, but independently review[ ] the correctness of the judge's application of constitutional principles to the facts found." *Commonwealth* v. *Mello,* 420 Mass. 375,

381 n.8 (1995). See *Commonwealth* v. *Mandile,* 397 Mass. 410, 412-413 (1986).

3. *Custody.* "Miranda warnings are only necessary for 'custodial interrogation.'" *Commonwealth* v. *Jung,* 420 Mass. 675, 688 (1995), quoting *Miranda* v. *Arizona,* 384 U.S. 436, 444 (1966). Therefore, before asking whether the defendant's waiver of Miranda rights was valid, we must determine whether Miranda warnings were necessary at all. Custodial interrogation is "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." *Id.,* quoting *Miranda* v. *Arizona, supra.* The following factors are relevant in determining whether custodial interrogation has occurred: "(1) the place of the interrogation; (2) whether the investigation has begun to focus on the suspect, including whether there is probable cause to arrest the suspect[6]; (3) the nature of the interrogation, including whether the interview was aggressive or, instead, informal and influenced in its contours by the suspect; and (4) whether, at the time the incriminating statement was made, the suspect was free to end the interview by leaving the locus of the interrogation or by asking the interrogator to leave, as evidenced by whether the interview terminated with the defendant's arrest." *Id.* at 688, quoting *Commonwealth* v. *Bryant,* 390 Mass. 729, 737 (1984).

Here, the defendant was interrogated while in police custody and therefore Miranda warnings were required. The defendant was interviewed in a closed room at a police station by a succession of three law enforcement officers over a period of approximately seven hours. The questions focused almost exclusively on her possible criminal involvement in the death of her son in 1988. She was never told she could leave, and was told at least once to wait for the next officer to arrive. On several occasions she told her interrogators that, if she told them everything, she would be arrested. Throughout the interviews, she sought help in being committed to a mental facility, and was repeatedly told that she would not receive that help until she answered the interrogators' questions. Together, these facts support the judge's finding that the de-

[6]But cf. *Stansbury* v. *California,* 511 U.S. 318, 326 (1994) ("any inquiry into whether the interrogating officers have focused their suspicions upon the individual being questioned [assuming those suspicions remain undisclosed] is not relevant for purposes of *Miranda*").

fendant was in custody. See *Commonwealth* v. *Damiano*, 422 Mass. 10, 13 (1996); *Commonwealth* v. *A Juvenile*, 402 Mass. 275, 277-278 (1988).

The Commonwealth argues that other facts indicate that the defendant was not in custody. They point to the defendant's voluntary arrival at the police station, her agreement to talk to police, the presence of Montmarquet throughout the interviews, and the fact that the defendant left the station with Montmarquet without having been arrested. The Commonwealth also notes that the defendant was offered food and coffee, and that she was not verbally or physically threatened or abused by the officers. While the Commonwealth concedes that the defendant was never told she could leave, it emphasizes that she was never told she could *not* leave. None of these factors is dispositive, however, and must be viewed in light of the entire set of circumstances. On balance, these facts do not require us to reject the judge's finding. Cf. *Commonwealth* v. *Buckley*, 410 Mass. 209, 217-218 (1991); *Commonwealth* v. *Harris*, 387 Mass. 758, 765 (1982).

4. *Waiver of Miranda rights.* The defendant argues that her waiver of Miranda rights was invalid. We agree. "The Commonwealth bears the burden of proving the validity of a Miranda waiver beyond a reasonable doubt." *Commonwealth* v. *Edwards*, 420 Mass. 666, 669 (1995). "To be valid the waiver must be made voluntarily, knowingly, and intelligently." *Id.* at 670. "In determining whether a waiver was made voluntarily, the court must examine the totality of the circumstances surrounding the making of the waiver." *Id.*

The defendant's waiver of her right to remain silent and her right to counsel did not meet the above standard. First, it is relevant that the police failed scrupulously to honor those rights. See *Commonwealth* v. *Jackson*, 377 Mass. 319, 326 (1979). Cf. *Commonwealth* v. *Pennellatore*, 392 Mass. 382, 387 (1984).[7] Although the defendant refused on several occasions to answer questions regarding her specific involvement in the death of her child, the questioning continued. When told of her right to have an attorney present during the

---

[7]Because we conclude that the defendant's waiver of her Miranda rights was invalid, we need not consider whether the police were required to stop questioning her because she had invoked her right to remain silent. Cf. *Davis* v. *United States*, 512 U.S. 452, 458-459 (1994).

questioning, the defendant said she did not know any at-
torneys and wondered how she could get an attorney to the
police station at that hour on the Fourth of July. We agree
with the motion judge that McNiff's response — to point to
the telephone and tell the defendant she could call anyone she
wanted — was "less than adequate." See *Commonwealth* v.
*Hosey*, 368 Mass. 571, 578 (1975) (Miranda waiver was in-
valid where police put burden on defendant to insist on
lawyer).

Second, the defendant's physical and emotional condition
indicates that the waiver was not knowing or voluntary. See
*Commonwealth* v. *Koney*, 421 Mass. 295, 304-305 (1995). The
record supports the judge's finding that the defendant was
suffering from lack of sleep and that she had been emotion-
ally distraught throughout the entire interrogation period,
with a number of episodes of forceful crying and uncontroll-
able shaking. Third, the physical location of the interroga-
tions (in a closed police station office, in the presence of as
many as three officers at one time), their timing (in the early
morning hours after a sleepless night) and length (seven
hours), created a coercive environment which made it more
difficult for the defendant to act rationally in protecting her
rights. Finally, the promise of the officers that, if the defen-
dant would give them the information they wanted, she would
receive the psychological help she was seeking, established a
quid pro quo situation which certainly affected the defendant's
capacity for a knowing and voluntary waiver.[8] For all these
reasons, we see no basis to interfere with the judge's ruling
that the defendant's waiver of her Miranda rights was not
voluntary. See *Commonwealth* v. *Meehan*, 377 Mass. 552,
567-568 (1979), cert. dismissed, 445 U.S. 39 (1980); *Com-
monwealth* v. *Jackson*, *supra* at 329.

5. *Voluntariness of the defendant's statements.* Due process
requires a separate inquiry into the voluntariness of the state-
ment, apart from the validity of the Miranda waiver. *Com-
monwealth* v. *Edwards*, *supra* at 673. See *Colorado* v. *Con-
nelly*, 479 U.S. 157, 169-170 (1986). In this determination, we

---

[8]The Commonwealth points in part to the written waiver as evidence
that the defendant acted voluntarily. While such a writing is some evi-
dence, it is not dispositive. See *Commonwealth* v. *Philip S.*, 414 Mass. 804,
813 n.7 (1993). We still must analyze the totality of the circumstances to
determine the validity of a Miranda waiver.

look at the totality of the circumstances surrounding the making of the statement, "to ensure that the defendant's confession was a free and voluntary act and was not the product of inquisitorial activity which had overborne [her] will." *Commonwealth* v. *Mahnke*, 368 Mass. 662, 680 (1975), cert. denied, 425 U.S. 959 (1976). "Relevant factors include, but are not limited to, 'promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings.' " *Commonwealth* v. *Selby*, 420 Mass. 656, 663 (1995), quoting *Commonwealth* v. *Mandile, supra* at 413.

The circumstances surrounding the giving of the statement support the judge's finding that the statement was not voluntary. In particular, the promise that the defendant would receive the medical treatment she consistently requested, in return for her statement to the police regarding her involvement in the death of her child, constituted a form of psychological coercion which, in view of the defendant's debilitated physical and emotional state and the physical and temporal circumstances of the interrogations, rendered the statements involuntary. See *O'Tinger* v. *State*, 342 So. 2d 1343, 1345-1346 (Ala. Crim. App. 1977) (withholding requested medical treatment until defendant confessed rendered confession involuntary); *People* v. *Hogan*, 31 Cal. 3d 815, 838-839, 841 (1982) (promising defendant that he would receive psychological help if he confessed rendered confession involuntary), overruled on other grounds, *People* v. *Cooper*, 53 Cal. 3d 771, 836, cert. denied, 502 U.S. 1016 (1991); *State* v. *Allies*, 186 Mont. 99, 112-115 (1979) (leading defendant to believe that confessing would allow him to get psychological help rendered confession involuntary). See also *United States* v. *Wauneka*, 842 F.2d 1083, 1088 (9th Cir. 1988) (threat to withhold medical care from defendant's pregnant girl friend, if proved, would have raised colorable claim of psychological coercion); *Miller* v. *Fenton*, 741 F.2d 1456, 1467 n.21 (3d Cir. 1984) ("if [police] questioning had in fact induced [the defendant] to confess in the belief that [she] would receive psychological 'help' rather than punishment, the confession

would not be 'voluntary' "), rev'd on other grounds, 474 U.S. 104 (1985).

Our recent cases involving police deception are not to the contrary. See *Commonwealth* v. *Edwards, supra* at 674; *Commonwealth* v. *Selby, supra* at 665. In those cases, we concluded that police deception regarding the facts of a particular crime or the existence of evidence linking the defendant to the crime did not, by itself, render a confession involuntary. Here, the police did not deceive the defendant regarding the death of her son or about any other crime they suspected her of committing. Cf. *Commonwealth* v. *Selby, supra* at 664. Instead, they withheld the medical treatment she had requested until she provided them with a statement about her involvement in the death of her son. Once the defendant provided a signed statement, the police provided her with access to a mental health facility. Given all the other circumstances of the defendant's seven-hour stay at the police station, particularly her lack of sleep and unstable emotional state, there is significant support for the judge's conclusion. See *Commonwealth* v. *Meehan, supra* at 568; *Commonwealth* v. *Hosey, supra*; *Commonwealth* v. *Scherben*, 28 Mass. App. Ct. 952, 953 (1990). Cf. *Commonwealth* v. *L'Abbe*, 421 Mass. 262, 270 (1995).

6. *Conclusion.* We therefore affirm the motion judge's conclusions that the Commonwealth failed to sustain its burden on the issues of the validity of the defendant's waiver of Miranda rights and the voluntariness of the defendant's statement. Accordingly, we affirm the order allowing the defendant's motion to suppress.

*So ordered.*