COMMONWEALTH *vs.* KEVIN FEENEY.

No. 12-P-164.

Suffolk. April 3, 2013. - August 12, 2013.

Present: GRASSO, KATZMANN, & GRAINGER, JJ.

*Practice, Criminal,* Motion to suppress, Admissions and confessions, Voluntariness of statement, Waiver. *Constitutional Law,* Admissions and confessions, Waiver of constitutional rights. *Evidence,* Admissions and confessions, Voluntariness of statement. *Waiver.*

A District Court judge erred in partially granting a criminal defendant's pretrial motion to suppress statements that he made to police identifying incriminating evidence as his, as well as an inventory sheet that he signed at the police station, where the defendant knowingly, intelligently, and voluntarily had waived his constitutional right to remain silent [129-130]; and where, although the police subsequently obtained the evidence via a ruse of the inventory process deliberately in order to search for evidence, the police did not overbear the defendant's rational intellect and free will such that his statements and his signing of the inventory sheet were not the result of a free and voluntary act [131-135].

COMPLAINT found and returned in the Charlestown Division of the Boston Municipal Court Department on January 31, 2011.

Following transfer to the Central Division of the Boston Municipal Court Department, a pretrial motion to suppress evidence was heard by *Annette Forde,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Francis X. Spina,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by him to the Appeals Court.

*Donna Jalbert Patalano,* Assistant District Attorney, for the Commonwealth.

*Krista M. Larsen* for the defendant.

KATZMANN, J. After an evidentiary hearing, a District Court judge partially allowed the defendant's motion to suppress his

statements identifying incriminating evidence as his and an inventory sheet that he signed.[1] The police had obtained the evidence via a ruse that the judge determined violated the defendant's rights under the Fifth Amendment to the United States Constitution. The Commonwealth has pursued an interlocutory appeal and argues that the defendant knowingly and voluntarily waived his constitutional right to remain silent and that the police ruse did not overbear the defendant's free will. We agree and reverse the motion judge's decision to suppress.

*Background.* 1. We begin with a summary of the motion judge's findings, supplemented by uncontroverted testimony from the suppression hearing that the motion judge implicitly credited. See *Commonwealth* v. *Washington*, 449 Mass. 476, 477 (2007). On the night of January 31, 2011, State police Trooper Manning was conducting traffic enforcement at the Route 99 rotary in Charlestown. At roughly 1:20 A.M., he observed a white Cadillac automobile approach the rotary and without stopping, or even slowing down at a stop sign, accelerate to a speed of up to forty miles per hour and drive through the rotary. Trooper Manning put on his headlights and drove after the Cadillac. Upon observing the Cadillac drive through a red light on Cambridge Street, Trooper Manning activated his blue lights and his "takedown lights" — bright lights that allow the trooper to see into the vehicle in front of him. Trooper Manning observed two males in the Cadillac. After following the Cadillac for a short distance, Trooper Manning observed that the Cadillac did not stop or slow down. At this point, Trooper Manning turned on his siren. Eventually, after driving approximately eight blocks, the driver of the Cadillac pulled over at the intersection of Green Street and Bunker Hill Street. Trooper Manning pulled over alongside the Cadillac in an attempt to block the driver from pulling away. The operator of the Cadillac then accelerated, striking the cruiser as he sped away from the scene. Trooper

---

[1] The Boston Municipal Court had issued a criminal complaint against the defendant charging him with (1) resisting arrest, (2) possession of a firearm without a firearm identification (FID) card, (3) possession of a loaded firearm, (4) a firearm violation with prior convictions of three violent crimes or three serious drug offenses, (5) possession of ammunition without an FID card, (6) possession of a firearm without a license outside the home or office, second offense, and (7) disorderly conduct.

Manning then radioed dispatch and reported that he was in pursuit of the Cadillac. Trooper Manning tried to follow the Cadillac, but eventually, he lost sight of the car.

After receiving the radio dispatch, Trooper O'Neill joined the police chase. He observed the Cadillac go by with two cruisers following. Trooper O'Neill decided not to follow the Cadillac and, instead, drove to a position where he would be able to see the Cadillac in the event that it "doubled back." Soon after, Trooper O'Neill observed the Cadillac go by him once again, and he then followed in pursuit. The Cadillac then crashed into a backhoe that had been engaged in snow removal at the intersection of Bunker Hill Street and Baldwin Street. When he arrived at the crash site, Trooper O'Neill did not observe any passengers in the car. Trooper O'Neill decided to search the area in the vicinity of the crash and found the defendant, wearing a T-shirt and blue jeans, and with a fresh cut on his forehead, one block from the scene of the crash. Trooper O'Neill observed that the defendant had an odor of alcohol as well as of a deployed airbag.[2] Trooper O'Neill asked the defendant where he was coming from. The defendant replied that he was coming from his girlfriend's home; however, the defendant was unable to identify his girlfriend's address. Trooper O'Neill then radioed Trooper Manning and told him to come to his location. Soon thereafter, the police also apprehended the other occupant of the car.

Upon arriving at the scene, Trooper Manning took the defendant into custody. Trooper O'Neill then returned to the scene of the crash, while Trooper Manning remained with the defendant and proceeded to ask him a series of questions. He asked the defendant if he had been involved in the crash of the Cadillac, and the defendant denied any involvement. Trooper Manning then asked the defendant what he was doing at this hour of the night. The defendant replied that he was coming from his girlfriend's home, but he was again unable to provide his girlfriend's address. Trooper Manning then explained the basis for the defendant's arrest and provided the defendant with his Miranda rights. The defendant replied that he understood his rights, and he did

_____

[2]During the suppression hearing, Trooper O'Neill provided detailed testimony that a deployed air bag has a "very distinct odor" and that he had investigated many automobile accidents in which air bags had been deployed.

not make any additional statements. Trooper Manning then transported the defendant back to the scene of the crash.

At this point, roughly forty-five minutes to an hour after initially locating the defendant, Trooper O'Neill brought the defendant to his cruiser. According to Trooper O'Neill, the defendant continued to smell of alcohol and he also had bloodshot and watery eyes. Trooper O'Neill read the defendant the Miranda rights from a card that he carries in his wallet. After each section of the Miranda warnings, Trooper O'Neill asked the defendant if he understood his rights. The defendant provided oral acknowledgment that he understood. Trooper O'Neill then asked the defendant a series of questions. He asked the defendant why he ran from the Cadillac involved in the accident; the defendant replied, "What Cadillac?" Trooper O'Neill then told the defendant that the police had recovered a gun in the Cadillac and asked the defendant if he knew to whom the gun belonged. The defendant replied that he did not know anything about the gun.

Trooper Manning next spoke with the defendant at the police barracks, roughly an hour and a half after their initial conversation at the scene of the accident. The defendant had already gone through the booking process and had been placed in a holding cell.[3] Trooper Manning approached the defendant with three pieces of property: (1) the defendant's wallet, which Trooper Manning had recovered from the scene of the accident, (2) a cellular telephone (cell phone) that Trooper Manning had recovered from the inside of the Cadillac during his inventory search of the vehicle, and (3) a cell phone that belonged to the other occupant of the car. During the suppression hearing, Trooper Manning explained that he approached the defendant with the explicit purpose of having him "identify the phone that [Trooper Manning] found in the car."

Trooper Manning told the defendant that normally during booking, the police would have inventoried his property and created a printed inventory sheet for him to sign. However, Trooper Manning explained that this routine procedure did not

[3]During the suppression hearing, Trooper Manning testified that as a general matter, during the booking process, the police ask the arrestee for biographical information that the police then enter into their reporting system. The police also photograph and fingerprint the arrestee and inventory the arrestee's property.

happen in this case. Trooper Manning further explained that he planned to handwrite an inventory sheet and asked for the defendant's assistance in identifying his property. First, Trooper Manning asked the defendant to identify his wallet and to count the money that it contained. The defendant complied. Then, Trooper Manning asked the defendant to identify which of the two cell phones belonged to him. The defendant identified the cell phone that Trooper Manning had recovered from the passenger seat of the Cadillac. Later that night, Trooper Manning returned to the defendant's cell, where he had the defendant sign a handwritten inventory sheet drafted by Trooper Manning, detailing that both the wallet and the cell phone belonged to the defendant.

2. The defendant sought to suppress all statements that he made to the police — both those made to Trooper O'Neill while in his cruiser and those made to Trooper Manning at the station — as well as the inventory sheet drafted by Trooper Manning. After an evidentiary hearing, the motion judge declined to suppress the defendant's statements to Trooper O'Neill but did suppress the defendant's statements to Trooper Manning as well as the inventory sheet. The motion judge provided the following explanation for her decision to suppress the statements and the inventory sheet:

> "The statements the defendant made to officers at State Police barracks were made after he had been given Miranda warnings at least two times. From all appearances, and based on the credible testimony of Trooper O'Neill, I find that he understood and verbally acknowledged his understanding of those warnings. . . . Telling the defendant that he was required to sign a handwritten inventory form may or may not have been a ruse specifically intended to obtain a statement for him tying him to both the car, and the cell phone, which was found in the car. Whether or not it was, the defendant is entitled to the benefit of the doubt on the issue, given the crucial nature of [the] constitutional right to not incriminate oneself.

> "Our courts have long eschewed the use of deceptive practices to obtain confessions and incriminating evidence. See, e.g., Commonwealth v. Jackson, 377 Mass. 318, 328 n.8 (1979), cited in Commonwealth v. Selby, 420 Mass.

656, 665 (1995), as a reminder of the Court's disapproval of such tactics. The cell phone was not among the defendant's possessions at the time that he was booked. There was, therefore, no requirement that it be a part of the inventory of the defendant's personal property. Therefore, the motion to suppress the identification of the cell phone by the defendant as his, and the handwritten inventory form he signed, acknowledging the same, is allowed."

*Discussion.* The main question before us is whether Trooper Manning engaged in a ruse that overbore the defendant's free will and led the defendant to incriminate himself. In reviewing a ruling on a motion to suppress evidence, we accept the judge's subsidiary findings of fact absent clear error. The weight and credibility to be given oral testimony is for the judge to determine. See *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). However, we review independently the motion judge's application of constitutional principles to the facts found. *Commonwealth* v. *Contos*, 435 Mass. 19, 32 (2001).

In order for the defendant's statements acknowledging ownership of his cell phone to be admissible, (1) the police must have adhered to the Miranda requirements, (2) the defendant must have knowingly, intelligently, and voluntarily waived his rights, and (3) the defendant must have made the statements freely and voluntarily. See *Commonwealth* v. *Garcia*, 379 Mass. 422, 428 (1980).

1. We first consider whether the defendant knowingly, intelligently, and voluntarily waived his constitutional right to remain silent. We agree with the motion judge insofar as she determined that the defendant validly waived his Miranda rights before making his statements to Trooper Manning identifying the cell phone as belonging to him. "The principal inquiry remains whether the defendant, 'with a full knowledge of his legal rights, knowingly and intelligently relinquish[ed] them.' " *Commonwealth* v. *Martinez*, 458 Mass. 684, 692 (2011), quoting from *Commonwealth* v. *Cruz*, 373 Mass. 676, 687 (1977). As the judge found, the defendant had received and acknowledged his Miranda rights at least twice before he identified his cell phone to Trooper Manning. The defendant had received Miranda warnings, first from Trooper Manning at the scene of his ap-

prehension and then from Trooper O'Neill at the scene of the car accident, and, ultimately, he waived his rights.[4] While the defendant did not make any further statements immediately after Trooper Manning read him his rights, subsequently, after administering the Miranda warnings for the second time, Trooper O'Neill then asked an additional series of questions to which the defendant replied. The defendant answered Trooper O'Neill's questions whether he knew of the Cadillac involved in the accident or the handgun recovered from the car. The defendant denied knowledge of either the Cadillac or the handgun. In answering these questions, the defendant waived his Miranda rights, and the waiver was voluntary, knowing, and intelligent in the circumstances here. See *Commonwealth* v. *Parham*, 390 Mass. 833, 836, 838-840 (1984); *Commonwealth* v. *Williams*, 456 Mass. 857, 864 (2010); *Commonwealth* v. *Gonzalez*, 59 Mass. App. Ct. 622, 624-625, 627 (2003).[5,6]

Thus, at the time that Trooper Manning approached the defendant in his cell at the police station, roughly ninety minutes after the arrest, Trooper Manning did not need to reissue the Miranda warnings to the defendant. See *Commonwealth* v. *Mello*, 420 Mass. 375, 386 (1995). Although the defendant had waived his rights, he could have reasserted them at any point. See *Miranda* v. *Arizona*, 384 U.S. 436, 473-474 (1966); *Commonwealth* v. *Obershaw*, 435 Mass. 794, 800 (2002). He did not do so.

---

[4] The record does not indicate that the defendant ever invoked his right to remain silent. Compare *Commonwealth* v. *Clarke*, 461 Mass. 336, 338, 350 (2012). Although the defendant did not answer additional questions after Trooper Manning first administered Miranda warnings, he willingly spoke to Trooper O'Neill after receiving and acknowledging that he understood the warnings for the second time.

[5] The motion judge found "that although the defendant may have been intoxicated to some extent at the time of his apprehension and arrest, he was not so mentally or physically impaired, as he argued at the hearing, as to render involuntary the nature of his statements or the waiver of his rights." On the record under review, we see no reason to disturb this determination. See *Commonwealth* v. *Wolinski*, 431 Mass. 228, 231-233 (2000).

[6] In her memorandum of decision, the motion judge found that "[a]fter he was given Miranda warnings the very first time, the defendant refused to say anything further to the officers." While it is true that after he received the first set of Miranda warnings, the defendant did not say anything to Trooper Manning, the defendant then answered the questions by Trooper O'Neill after he received his second set of warnings.

2. "Because the defendant was advised of, and waived, [his] Miranda rights, the issue becomes whether the Commonwealth has proved . . . that [his] statements were otherwise voluntary." *Commonwealth* v. *Tolan,* 453 Mass. 634, 642 (2009). We review "the totality of the circumstances." *Ibid.* The defendant stopped talking to the police after receiving Miranda warnings for the first time and denied any knowledge of the Cadillac and the gun after he had received Miranda warnings for the second time. These circumstances indicate that the defendant's initial statements to the police were the "product of a free will, and not the result of coercion or intimidation." *Commonwealth* v. *Mello,* 420 Mass. at 383. In short, as the motion judge determined, all of the defendant's initial statements were voluntary. The motion to suppress in that respect was properly denied.

With respect to the defendant's subsequent identification of his cell phone, we conclude that Trooper Manning's statement to the defendant did not overbear the defendant's will to an extent that would have rendered his statements involuntary. "A statement is voluntary if it is the product of a 'rational intellect' and a 'free will.' " *Commonwealth* v. *Selby,* 420 Mass. at 662, quoting from *Commonwealth* v. *Davis,* 403 Mass. 575, 581 (1988). "In determining whether a statement was made voluntarily, in compliance with due process of law, [the Court will] examine whether, in light of the totality of the circumstances surrounding the making of the statement, the will of the defendant was overborne to the extent that the statement was not the result of a free and voluntary act." *Commonwealth* v. *Selby, supra* at 662-663. As the defendant filed the motion to suppress the statements at issue, "it was the Commonwealth's burden to establish, beyond a reasonable doubt, that [the defendant's] confession was voluntary. . . . It is not up to a defendant to establish involuntariness." *Commonwealth* v. *DiGiambattista,* 442 Mass. 423, 439 (2004).

As has been noted, in her ruling, the motion judge focused on the implications of the police ruse on the voluntariness of the defendant's statement. She noted that "[o]ur courts have long eschewed the use of deceptive practices to obtain confessions and incriminating evidence." The judge also reasoned that "[w]hether or not [telling the defendant he was required to sign a handwrit-

ten inventory form] was [a ruse], the defendant is entitled to the benefit of the doubt on the issue, given the crucial nature of [the] constitutional right to not incriminate oneself."

To be sure, the Supreme Judicial Court has "expressed [its] disapproval of police tactics that employ the use of false statements during an interrogation because such tactics cast doubt on the voluntariness of any subsequent confession or admission." *Commonwealth* v. *Tremblay*, 460 Mass. 199, 208 (2011), citing *Commonwealth* v. *DiGiambattista*, 442 Mass. at 432. See *Commonwealth* v. *Jackson*, 377 Mass. 319, 328 n.8 (1979); *Commonwealth* v. *Edwards*, 420 Mass. 666, 671 (1995). "*Nonetheless*, [the Court also has] repeatedly held that such deception or trickery does not necessarily compel suppression of the confession or admission but, instead, is *one factor* to be considered in a totality of the circumstances analysis" (emphases supplied). *Commonwealth* v. *Tremblay*, *supra*. "Relevant factors include, but are not limited to, promises or other inducements, conduct of the defendant, the defendant's age, education, intelligence, and emotional stability, experience with and in the criminal justice system, physical and mental condition, the initiator of the discussion of a deal or leniency (whether the defendant or the police), and the details of the interrogation, including the recitation of Miranda warnings." *Commonwealth* v. *Selby*, 420 Mass. at 663, quoting from *Commonwealth* v. *Mandile*, 397 Mass. 410, 413 (1986). Moreover, "[i]n those cases where 'the use of a false statement is the *only* factor pointing in the direction of involuntariness, it will not ordinarily result in suppression, but . . . if the circumstances contain additional indicia suggesting involuntariness, suppression will be required' " (emphasis in original). *Commonwealth* v. *Tremblay*, 460 Mass. at 208, quoting from *Commonwealth* v. *DiGiambattista*, 442 Mass. at 433.

Most cases involving police ruses or trickery concern attempts by the police to secure a confession from a defendant by presenting the defendant with false evidence implicating the defendant's guilt. In ruse cases where the Supreme Judicial Court has suppressed confessions, there have been generally additional circumstances, apart from the ruse itself, that rendered the confession involuntary. See, e.g., *Commonwealth* v. *Baye*,

462 Mass. 246, 257 (2012) (judge suppressed confession where police officers not only exaggerated the strength of the evidence against the defendant, but also minimized the moral and legal gravity of the alleged crime; suggested that if he did not confess, he would be charged with more serious crimes; mischaracterized the applicable law surrounding the charged crime; and finally, after the defendant invoked his right to counsel, dissuaded the defendant from consulting with a lawyer); *Commonwealth* v. *DiGiambattista*, 442 Mass. at 433-436 (judge suppressed confession where in addition to presenting the defendant with false evidence suggesting his guilt, the police minimized the defendant's alleged criminal behavior and implicitly promised leniency as well as alcohol counseling if the defendant confessed). Compare *Commonwealth* v. *Selby*, 420 Mass. at 664-665 (judge did not suppress defendant's confession where only improper factor was police use of false information — pretending to have fingerprints from the defendant at the scene of the crime — to secure a confession).

In the case at bar, the police deployed a stratagem of a different type from those ruses involving false evidence that suggested a defendant's guilt. Namely, the police did not use or pretend to have false evidence implicating the defendant's involvement in the alleged crime. Trooper Manning, by his own admission, approached the defendant in his cell with a plan in mind that would lead the defendant to admit to possession of the cell phone recovered from the Cadillac. The Commonwealth could then use the cell phone as an additional link connecting the defendant to the Cadillac and, ultimately, to strengthen its case against the defendant. When Trooper Manning approached the defendant in his cell, the defendant had already gone through the routine booking process. During the booking process, the police do not need to issue Miranda warnings before asking a defendant routine background questions, such as those regarding a defendant's name, address, and related matters that are not designed to elicit an incriminating response. See *Pennsylvania* v. *Muniz*, 496 U.S. 582, 601-602 (1990); *Commonwealth* v. *Acosta*, 416 Mass. 279, 283 (1993). These questions are designed to gather biographical information for administrative purposes, rather than testimonial evidence for trial. *Pennsylvania* v. *Muniz*, *supra*. Trooper Manning couched his questioning of

the defendant as part of the innocuous, routine booking process, rather than as a deliberate attempt to elicit incriminating statements from the defendant.[7]

In her decision, the motion judge concluded that "[t]he cell phone was not among the defendant's possessions at the time that he was booked. There was, therefore, no requirement that it be a part of the inventory of the defendant's personal property." We agree. There certainly was no requirement that Trooper Manning inventory the cell phone, or the wallet, as part of the defendant's personal property because the defendant did not enter the precinct with either item in his possession. See *Commonwealth* v. *Vuthy Seng,* 436 Mass. 537, 550-551 (2002) ("[B]efore a person is placed in a cell, the police, without a warrant, but pursuant to standard written procedures, may inventory and retain in custody, all items on the person, including even those within a container, such as a wallet. . . . Such searches are justified to safeguard the defendant's property, protect the police against later claims of theft or lost property, and keep weapons and contraband from the prison population. . . . Such inventory searches are intended to be 'noninvestigatory' " and should not be "a search for evidence"). Here, Trooper Manning chose to "inventory" the items in an effort to obtain an admission by the defendant to incriminating evidence. Thus, by his own admission, he created a ruse of an inventory process deliberately in order to search for evidence. See *Commonwealth* v. *Sullo,* 26 Mass. App. Ct. 766, 772 (1989).

Ultimately, as the motion judge found, the police ruse, as in *Commonwealth* v. *Selby,* 420 Mass. at 664-665, was the only factor weighing on the voluntariness of the defendant's incriminatory statement. Both Trooper Manning and Trooper O'Neill had provided the defendant with his Miranda warnings, and the defendant had voluntarily waived his rights when he chose to speak with Trooper O'Neill at the station. See *Commonwealth* v. *Williams,* 456 Mass. at 864, 865; *Commonwealth* v. *Gonzalez,*

---

[7]Police may not ask questions "designed to elicit incriminating admissions" under the guise of booking questions. *Pennsylvania* v. *Muniz,* 496 U.S. at 602 n.14. *Commonwealth* v. *Acosta,* 416 Mass. at 283-284. Here, however, as noted, the defendant had been given Miranda warnings earlier by Trooper O'Neill and had waived his Miranda rights in responding to Trooper O'Neill's questions at that time.

*supra.* The police did not make any promises of leniency or minimize the gravity of the alleged crime. Compare *Commonwealth* v. *DiGiambattista*, 442 Mass. at 433-436; *Commonwealth* v. *Baye*, 462 Mass. at 257. We must decide each case on its own facts. Under a different set of circumstances, the police ruse might have led to suppression of the evidence. In the case at bar, however, after considering the totality of the circumstances surrounding the defendant's statements to the police, we conclude that the defendant voluntarily admitted ownership of his cell phone. The police did not overbear the defendant's rational intellect and free will such that his statement identifying the cell phone as his and his signing of the supposed inventory form were not the result of a free and voluntary act. See *Commonwealth* v. *Jackson*, 377 Mass. at 328 n.8; *Commonwealth* v. *Forde*, 392 Mass. 453, 454-456 (1984); *Commonwealth* v. *Holley*, 79 Mass. App. Ct. 542, 547 (2011). The order partially allowing the motion to suppress is reversed.

*So ordered.*